**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CHRISTOPHER BLAKE and JAMES ORKIS, individually and on behalf of all others similarly situated, | ) Civil Action No.: ) ) |
| Plaintiffs, | ) ) ) CLASS ACTION COMPLAINT |
| v. | ) ) |
| JPMORGAN CHASE BANK, N.A., CHASE BANK USA, N.A., JPMORGAN CHASE & CO., and CROSS COUNTRY INSURANCE COMPANY, | ) ) JURY TRIAL DEMANDED ) ) ) |
| Defendants. | ) ) |

## INTRODUCTION

1.      This is a proposed nationwide class action brought by Christopher Blake and James Orkis ("Plaintiffs") on behalf of themselves and all other similarly situated persons who obtained residential mortgage loans originated, funded and/or originated through correspondent lending by defendants JPMorgan Chase Bank, N.A., Chase Bank USA, N.A. and JPMorgan Chase & Co., ("JPMorgan"), together with their affiliated reinsurer Cross Country Insurance Co. ("Cross Country") (together with JPMorgan, "Defendants") their successors or assigns, or any of their subsidiaries and/or affiliates, between January 1, 2004 and the present (the "Class Period") and who, in connection therewith, purchased, either directly or indirectly, private mortgage insurance that was reinsured with JPMorgan's captive reinsurance affiliate, Cross Country. Plaintiffs and all other similarly situated persons as alleged in this paragraph are referred to herein as the "Class."

2.      In this action, Plaintiffs challenge Defendants' violations of the strict prohibition against kickbacks, referral payments and unearned fee splits codified in the Real Estate Settlement Procedures Act of 1974 ("RESPA").  In particular, JPMorgan and Cross Country,

under an agreement or understanding with several private mortgage insurance providers, including but not limited to PMI Mortgage Insurance Company ("PMIC"), United Guaranty Residential Insurance Co. ("UGI"), Mortgage Guaranty Insurance Company ("MGIC"), Radian Guaranty, Inc. ("Radian"), Genworth Mortgage Insurance Company ("Genworth"), Republic Mortgage Insurance Company ("Republic"), and Triad Guaranty Insurance Corporation ("Triad") (collectively, the "Private Mortgage Insurers") violated RESPA in two ways:  (i) in exchange for JPMorgan's referral of its mortgage borrowers' business, Cross Country (and, therefore, JPMorgan) received illegal referral payments in the form of purported reinsurance premiums from the Private Mortgage Insurers; and (ii) Cross Country (and, therefore, JPMorgan) received an unlawful split of private mortgage insurance premiums paid by the borrowers that JPMorgan referred to the Private Mortgage Insurers.  A portion of the premiums that Class members have paid and continue to pay for their private mortgage insurance was and/or is ceded to Cross Country as a premium payment for putative "reinsurance."  In addition to Plaintiffs' claims under RESPA, for which they seek statutory damages, Plaintiffs seek restitution for Defendants' unjust enrichment.

3.      Private mortgage insurance, or PMI, is a form of insurance that home purchasers providing a down payment of less than 20% of the purchase price of their home are typically required to purchase at closing.  Although the private mortgage insurance premium is paid by the *borrower*, either directly or indirectly, private mortgage insurance protects the *lender* in the event of a default by the borrower, and borrowers typically have no involvement in selecting the private mortgage insurance provider.

4.      RESPA is the primary federal law regulating residential mortgage settlement services.  RESPA and regulations promulgated thereunder cover both:  (i) the "provision of

services involving mortgage insurance" and (ii) the referral by lenders of insurance business to private mortgage insurance providers.  *See* 12 U.S.C. § 2607(a); 24 C.F.R. § 3500.2(b).

5.     In particular, Section 2607(a) of RESPA prohibits any person from accepting or giving kickbacks or referral fees from any person providing a real estate settlement service, including private mortgage insurers.  Thus, a lender and/or its affiliated reinsurer cannot legally accept a referral fee or kickback from the insurer issuing the private mortgage insurance policy on a borrower's home.

6.     Separately, Section 2607(b) of RESPA prohibits lenders from accepting any portion of a settlement service fee—including amounts paid by borrowers for private mortgage insurance—from any person providing a real estate settlement service, including private mortgage insurers, other than for services actually performed.  Thus, a lender and/or its affiliated reinsurer cannot legally accept an unearned fee split from the insurer issuing the private mortgage insurance policy on a borrower's home.

7.     As alleged herein, in an effort to exploit the booming private mortgage insurance market for easy profits, Defendants violated RESPA's kickback and referral fee prohibitions through a scheme to provide sham reinsurance on private mortgage insurance policies.

8.     Specifically, upon information and belief, Defendants entered into an "agreement or understanding, oral or otherwise" pursuant to which the Private Mortgage Insurers paid (or "ceded") to JPMorgan's affiliated captive reinsurer, Cross Country, a significant portion of the mortgage insurance premiums they received from JPMorgan's borrowers in return for JPMorgan's referral of private mortgage insurance business.  *See* 12 U.S.C. § 2607(a).  In this regard, JPMorgan allocated its mortgage insurance business systematically among the Private Mortgage Insurers, and, in return, each of the Private Mortgage Insurers agreed to cede a portion

of the mortgage insurance premiums they received from JPMorgan borrowers to Cross Country in the form of purported "reinsurance" premiums.  Such payments, which Cross Country periodically passes through to its parent JPMorgan in the form of lucrative dividends and premium income, continue to date.

9.     While the Private Mortgage Insurers' payments to Cross Country are purportedly for "reinsurance" services, Cross Country has received them while assuming no actual or commensurate "risk" under the underlying reinsurance contracts, in light of applicable rules, regulations and standards.  Among other issues, upon information and belief, these contracts, which were not furnished to Plaintiffs or to other members of the Class and were not publicly available, provide the Private Mortgage Insurers with no recourse if Cross Country abandons its purported reinsurance obligations at any time, or if Cross Country provides only nominal capital to the dedicated trusts that purportedly exist to fund private mortgage reinsurance claims (as discussed in detail below at ¶¶ 73-76).  As a result:  (i) the purported reinsurance provided by Cross Country is illusory; (ii) the purported reinsurance contracts between Cross Country and the Private Mortgage Insurers are shams; and (iii) the payments or premiums ceded to Cross Country thereunder constitute improper referral fees or kickbacks to the Defendants that violate RESPA.

10.     Illustrating the scope and brazenness of Defendants' violations, from July 2005 through the end of 2012, Cross Country collected from the Private Mortgage Insurers **over $676 million** as its "share" of borrower's private mortgage insurance premiums. In contrast, Cross Country's "share" of paid claims from the reinsurance trusts during this time period was **only approximately $142 million**.  *See* Schedule F – Part 3 from the 2005-2012 Annual Statements filed with the NAIC by each of the Private Mortgage Insurers (showing the reinsurance premiums ceded to and the "losses" paid by Cross Country from the reinsurance trusts).

11.     Significantly, because the Private Mortgage Insurers with whom JPMorgan did business were part of the captive reinsurance scheme with the Defendants, Plaintiffs and the Class could not have obtained a settlement service that was free from the taint of the RESPA violations alleged herein.   As a result of Defendants' conduct, Plaintiffs and the Class were subjected to settlement services which included improper fees and kickbacks that violated RESPA, and had the direct and broad effect of "increas[ing] unnecessarily the cost of" the settlement service, private mortgage insurers, on a market-wide basis.   *See Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 756 n.2, 758 (3d Cir. 2009) ( "the provision of mortgage insurance is a 'settlement service' within the meaning of" RESPA); *see also* 12 U.S.C. § 2601(b) ("kickbacks or referral fees . . . tend to increase unnecessarily the costs of certain settlement services.").

12.     As *American Banker* magazine reported in connection with an investigation by the Inspector General of the Department of Housing and Urban Development ("HUD"), "beginning in the late 1990s major U.S. banks began coercing [private mortgage] insurers into cutting them in on what would ultimately amount to $6 billion of insurance premiums in exchange for assuming little or no risk."[1]   (*American Banker* is a specialized niche publication for professionals in the banking and financial industries.)   Lenders like JPMorgan created captive reinsurers to capitalize on the profits generated by private mortgage insurers (including the Private Mortgage Insurers) by utilizing carefully crafted reinsurance contracts to all but eliminate the lender's actual reinsurance risk exposure while receiving premium payments for assuming little or no risk.   Lenders like JPMorgan further insulated themselves from any losses in connection with the "reinsurance" it provides by: (i) making the relevant reinsurance arrangements "self-capitalizing," meaning that the reinsurer was only required to put "nominal

---

[1]     Jeff Horwitz, *Banks Took $6B in Reinsurance Kickbacks, Investigators Say*, American Banker (Sept. 6, 2011, 4:55 PM), http://www.americanbanker.com/.../176_173/mortgage-reinsurance-respa-kickbacks-hud-investigation-doj-1041928-1.html, attached as Exhibit 1 hereto ("Reinsurance Kickbacks").

initial capital" into the trusts supporting the reinsurance contracts; and (ii) providing no recourse for the reinsurer's failure to adequately fund the trusts.[2]   As *American Banker* described such arrangements:

> The banks were supposedly providing catastrophic reinsurance, but the policies appeared to render it impossible that they'd ever suffer significant losses.  In the event of catastrophic losses, a bank could simply walk away from its nominal initial investment and leave the insurer to bear the other costs.

*See* Ex. 2 (Mortgage Kickback Scheme).

13.   Under applicable accounting, actuarial and regulatory standards, such arrangements, in which no real risk is transferred, do not qualify as reinsurance.  In other words, JPMorgan and Cross Country were "playing with the house's money" because there was not an actual or commensurate transfer of risk.  As such, they were not providing actual reinsurance, but rather receiving improper fee payments and kickbacks from the Private Mortgage Insurers in clear violation of RESPA.

14.   The scheme between JPMorgan and the Private Mortgage Insurers, like similar schemes engaged in by other lenders and mortgage insurance providers, was uniform in its application and required the complicity and silence of all the Private Mortgage Insurers.  The fact that not one of the Private Mortgage Insurers either refused to enter into the reinsurance arrangement with JPMorgan or reported JPMorgan to the appropriate authorities demonstrates their complicity and collective participation in the scheme, which caused harm to each and every member of the Class regardless of their respective private mortgage insurer.  Moreover, each of the Private Mortgage Insurers benefitted as a result of their participation in the scheme.

15.   Significantly, Defendants' coordinated actions resulted in a reduction of

---

[2]       Jeff Horwitz, *Bank Mortgage Kickback Scheme Thrived Amid Regulatory Inaction*, American Banker (Sept. 16, 2011, 7:45 PM), http://www.americanbanker.com/issues/176_181/mortgages-reinsurance-deals-kickbacks -HUB-1042277-1.html, attached as Exhibit 2 hereto ("Mortgage Kickback Scheme").

competition in the mortgage insurance market and resulted in increased premiums for Plaintiffs and the Class.  *See generally*, 12 U.S.C. § 2601(b).

16.     This scheme constitutes disguised, unlawful referral fees in violation of RESPA's anti-kickback provisions, as well as a violation of RESPA's ban on accepting a percentage of settlement-service fees other than for services actually performed.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367 and 12 U.S.C. § 2614.

18.     Venue is proper in this district under 28 U.S.C. § 1391(b) and 12 U.S.C. § 2614 because the real property involved in one or more of Plaintiffs' mortgage loan transactions is located in this district, and a substantial part of the events giving rise to the claims occurred in this district.

## PARTIES

**A.     Plaintiffs**

19.     Plaintiff Christopher Blake obtained a mortgage loan from JPMorgan Chase Bank, N.A. on or about May 13, 2005, for the purchase of his home located in Reading, PA.  *See* Exhibit 3 (Blake Mortgage).  Plaintiff Christopher Blake was required to pay for PMI in the amount of $81.86 per month.  *See* Exhibit 4 attached hereto (Blake Estimate of Settlement Charges).   His Private Mortgage Insurer, Radian, was selected by his lender and, upon information and belief, was a provider with whom JPMorgan had a captive reinsurance arrangement. Upon information and belief, his loan was included in the JPMorgan captive reinsurance arrangement with Cross Country based on the date of origination and the type of loan.  While Defendants' documents informed Plaintiff Blake at his closing that his PMI "may"

be reinsured, Defendants never disclosed to Mr. Blake when Defendants had, in fact, reinsured his PMI with Cross Country.

20.     Plaintiff James Orkis obtained a mortgage loan from JPMorgan Chase Bank, N.A. on or about December 28, 2006, for the purchase of his home located in New Kensington, PA. *See* Exhibit 5 (Orkis Mortgage).  Plaintiff James Orkis was required to pay for PMI in the amount of $92.56 per month.  *See* Exhibit 6 attached hereto (Orkis Initial Escrow Disclosure). His Private Mortgage Insurer, MGIC, was selected by his lender and, upon information and belief, was a provider with whom JPMorgan had a captive reinsurance arrangement.  Upon information and belief, his loan was included in the JPMorgan captive reinsurance arrangement with Cross Country based on the date of origination and the type of loan.  While Defendants' documents informed Plaintiff Blake at his closing that his PMI "may" be reinsured, Defendants never disclosed to Mr. Blake when Defendants had, in fact, reinsured his PMI with Cross Country.

**B.     Defendants**

21.     Defendant JPMorgan Chase Bank, N.A., a subsidiary of JPMorgan Chase & Co., is a national banking association that conducts business in Pennsylvania and other states throughout the United States.  *See* Exhibit 7 hereto (shareholder information sheet from JPMorgan Chase & Co.'s 2010 Annual Report, listing JPMorgan Chase Bank, N.A. as a principal subsidiary of JPMorgan Chase & Co.).

22.     Defendant Chase Bank USA, N.A., also a subsidiary of JPMorgan Chase & Co., is a national banking association that conducts business in Pennsylvania and other states throughout the United States.  *Id.* (listing Chase Bank USA, N.A. as a principal subsidiary of JPMorgan Chase & Co.).

23.     Defendant JPMorgan Chase & Co. is a financial holding company incorporated in Delaware and headquartered in New York, NY.  *Id.* (listing the location of JPMorgan Chase & Co.'s corporate headquarters).

24.     Defendant Cross Country Insurance Company is a Vermont corporation.  Cross Country is a subsidiary of JPMorgan Chase Bank, N.A. and JPMorgan Chase & Co. and an affiliate of Chase Bank USA, N.A.  *See* Exhibit 8 attached hereto (Exhibit 21.1 to JPMorgan Chase & Co.'s 2012 Form 10-K, listing Cross Country as a subsidiary of both JPMorgan Chase Bank, N.A. and JPMorgan Chase & Co.); Exhibit 9 attached hereto (Comptroller of the Currency Corporate Decision #97-06, dated January 1997, regarding Chase Manhattan Bank USA, N.A.'s[3] intent to establish Cross Country as an operating subsidiary to reinsure mortgage insurance); Exhibit 10 attached hereto (*OCC approves Chase mortgage insurance application; First bank given reinsurance powers*, allBusiness.com (Jan. 23, 1997), http://www.allbusiness.com/banking-finance/banking-lending-credit-services/7027383-1.html, (noting that Chase Manhattan Bank USA, N.A.'s application to establish Cross Country as an operating subsidiary to reinsure mortgage insurance had been approved.[4]

25.     Each Defendant is a proper party to this action as each Defendant participated in the same coordinated, unitary scheme alleged herein and was a provider or recipient of the unlawful kickbacks and unearned fees described herein.

---

[3]     Chase Bank USA, N.A. was formerly known as Chase Manhattan Bank USA, N.A.  Chase Manhattan Bank USA, N.A. was a principal bank subsidiary of The Chase Manhattan Corporation.  In 2000, The Chase Manhattan Corporation merged with J.P. Morgan & Co. Inc. to form JPMorgan Chase & Co.

[4]     Chase Home Finance, LLC is the successor by merger to Chase Manhattan Mortgage Corporation.  Upon information and belief, Chase Home Finance, LLC merged with and into Defendant JPMorgan Chase Bank, N.A. on or about May 1, 2011 with JPMorgan Chase Bank, N.A. as the surviving entity.

## FACTUAL ALLEGATIONS

**A.    RESPA Prohibits Kickbacks for Referrals and Fee-Splitting Related to Private Mortgage Insurance Policies**

26.    RESPA is the primary federal law regulating residential mortgage settlement services and business activities incident to real estate settlement services.  During the Class Period, HUD was charged with enforcing RESPA.  HUD promulgated the implementing rules for RESPA, Regulation X, 24 C.F.R. § 3500.

27.    Since July 21, 2011, RESPA has been administered and enforced by the Consumer Financial Protection Bureau ("CFPB"), which was established by the Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act"), 12 U.S.C. §§ 5481(12)(M), 5514(b)-(c), and 5515(b)-(c).

28.    RESPA was enacted, in part, to curb kickbacks among real estate agents, lenders and other real estate settlement service providers and/or providers of business incident to real estate settlement services:  "It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result . . . in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services."  12 U.S.C. § 2601(b).

29.    Central to RESPA is its dual prohibition of referral fees and fee-splitting between persons involved in mortgage lending and/or real estate settlement services, found in Sections 8(a) and 8(b).

30.    RESPA Section 8(a), 12 U.S.C. § 2607(a), provides:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

31.     RESPA Section 8(b), 12 U.S.C. § 2607(b), provides:

> No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

32.     Regulation X, RESPA's implementing regulation, further provides that, "[a] charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section."  24 C.F.R. § 3500.14(c).

33.     In addition, the term "thing of value," as used in RESPA Section 8(a), 12 U.S.C. § 2607(a), is broadly defined, and is described in Regulation X as including:

> [W]ithout limitation, monies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distributions of partnership profits, franchise royalties, credits representing monies that may be paid at a future date, the opportunity to participate in a money-making program, retained or increased earnings, increased equity in a parent or subsidiary entity . . . . The term payment is used as synonymous with the giving or receiving any "thing of value" and does not require transfer of money.

24 C.F.R. § 3500.14(d).

34.     Private mortgage insurance business referred to a private mortgage insurer by a lender constitutes "business incident to or a part of a real estate settlement service" within the meaning of RESPA, 12 U.S.C. § 2607(a).  The term "settlement service" is liberally defined in RESPA and Regulation X and explicitly includes the "provision of services involving mortgage insurance."  24 C.F.R. § 3500.2(b).

35.     Under RESPA, therefore:  (i) JPMorgan and Cross Country were prohibited from accepting referral fees from a Private Mortgage Insurer and from splitting private mortgage insurance premiums with any Private Mortgage Insurer other than for reinsurance services actually performed by Cross Country; and (ii) the Private Mortgage Insurers were prohibited

from paying referral fees to JPMorgan or Cross Country and from paying to them any split of private mortgage insurance premiums other than for services actually performed by Cross Country.

**B.      The Private Mortgage Insurance and Reinsurance Industry**

36.      The private mortgage insurance industry began with the founding of MGIC in 1957 and grew to become dominated by MGIC and several other private mortgage insurers. Generally, the industry is represented by a trade association known as Mortgage Insurance Companies of America ("MICA").  According to its website, MICA's membership includes PMI, and new private mortgage insurance contracts for its member firms consistently exceeded $200 billion between 1998 and 2006 and topped $300 billion in 2007.  *See* http://www.privatemi.com/about.cfm.

37.      Because of the risk that the net proceeds from a foreclosed property may not be adequate to repay the full amount of a mortgage loan, residential mortgage lenders typically prefer to finance no more than 80% of the value of a home, with the remaining 20% being paid as a down payment by the borrower.  However, many potential homebuyers cannot afford to pay 20% of their home's purchase price as a down payment.  Private mortgage insurance, which protects the lender in the event of a default by the borrower, allows the lender to make a loan in excess of 80% of the home's value.

38.      Providers of private mortgage insurance are typically third-party companies that, in the event of default, agree to cover the first twenty to thirty percent of the amount of the potential claim for coverage, including unpaid principal, interest and certain expenses.

39.      While the lender is the beneficiary of the private mortgage insurance, the borrower pays for the insurance, either:  (i) directly through the addition of monthly premiums to

the borrower's monthly mortgage payment; or (ii) indirectly through a higher interest rate on the loan (the lender pays the initial private mortgage insurance premium as a lump sum and then passes this cost on the borrower in the form of a higher interest rate for the life of the loan).

40. Borrowers, like Plaintiffs, generally have no opportunity to comparison-shop for private mortgage insurance. Instead, the private mortgage insurance is arranged by the lender. Moreover, the terms and conditions of the insurance policy, as well as the cost of the policy, are determined by the lender and the private mortgage insurance provider, rather than negotiated between the borrower and the private mortgage insurance provider.

41. Reinsurance is a common practice in the insurance industry whereby primary insurers pay other insurers (reinsurers) to insure a portion of the risk the primary insurer has agreed to cover.

42. Milliman, Inc. ("Milliman"), an actuarial company which provided actuarial services to each (or most) of the top ten lenders and their captive reinsurers with regards to these captive arrangements, provided a diagram as part of a handout during a 2008 seminar for actuaries, the relevant portions of which are summarized below. For example, the following chart represents the basic and identical nature of the captive arrangements between and among the lenders, their reinsurance subsidiaries, and the private mortgage insurers:



*See* Private Mortgage Insurance: Beyond Carriers and Actuarial Opinions at 13, Prepared for 2008 Casualty Loss Reserve Seminar ("CLRS") by Milliman, available at: http://www.casact.org /education/clrs/2008/handouts/mrotek.pdf.  *See also* http://www.casact.org/education/clrs/2008/ index.cfm?fa=consess (regarding the 2008 CLRS).

43.     Reinsurance arrangements relating to private mortgage insurance generally take one of two forms:  "quota share" or "excess-of-loss."

44.     In a typical quota share reinsurance arrangement, the reinsurer agrees to assume a fixed percentage of all of the private mortgage insurer's insured losses.  Thus, if the private mortgage insurer experiences a loss, the reinsurer is expected to experience a loss in the percentage agreed upon in the reinsurance contract.

45.     In an excess-of-loss reinsurance arrangement, the reinsurer is liable only for a specified "band" of loss, with losses below and above the band covered by the primary insurer.

In other words, the reinsurer is liable only for claims (or a percentage thereof) above a particular point, commonly known as an attachment or entry point, and subject to a ceiling, commonly known as a detachment or exit point. Under this structure, the reinsurer's potential liability begins, if ever, only when the primary insurer's incurred losses reach the attachment point, and ends when such losses reach the detachment point.

## C.    HUD Notes the Potential for RESPA Violations Under Captive Reinsurance Arrangements

46.    In the early years of the private mortgage insurance industry, there were no financial ties between lenders and the private mortgage insurers. In the mid 1990s, however, mortgage companies began looking for ways to capitalize on the booming private mortgage insurance market.[5] In order to share in these profits, many lenders created captive reinsurance subsidiaries to enter into contracts with private mortgage insurance providers, whereby the reinsurer purportedly agreed to assume a portion of the private mortgage insurer's risk with respect to a given pool of loans. In return for a steady stream of business from the lender's referral of borrowers, a private mortgage insurer ceded to the lender's affiliated captive reinsurer a portion of the premiums it received from such borrowers.

47.    In 1997, HUD was the federal entity primarily responsible for interpreting and enforcing RESPA. Concerned that lenders' captive reinsurance arrangements with the Private Mortgage Insurers could be designed to disguise a funneling of referral fees back to the lender that had arranged for the private mortgage insurer to obtain business, HUD issued a letter to the General Counsel of Countrywide Funding Corporation dated August 6, 1997 ("HUD Letter")

---

[5]    *See* Exhibit 11 hereto (Timothy J. Cremin, *Using a Bank Captive Subsidiary to Reinsure Mortgage Insurance*, Mar. 23, 1998), http://www.captive.com/service/milliman/article3_mortgage.shtml. This article was published by the actuarial consultancy Milliman in the "Article Index" of a website maintained by Milliman that is dedicated to topics concerning "Captive Insurance," and that is intended to provide "a broad spectrum of services for . . . captive insurers," not home purchasers).

addressing the potential problem posed by lenders' captive reinsurers and RESPA's anti-kickback and improper fees provisions.  *See* Exhibit 12 (HUD Letter).

48.     The HUD Letter concluded that captive reinsurance arrangements were permissible under RESPA only "if the payments to the affiliated reinsurer:  (1) are for reinsurance services 'actually furnished or for services performed,' and (2) are *bona fide* compensation that does not exceed the value of such services."  *Id.* at 3.

49.     The HUD Letter evaluates potential violations of RESPA Section 8(a) and 8(b) based upon whether the arrangement between the lender's captive reinsurer and the private mortgage insurer represents "a real transfer of risk."  In determining whether there is a real transfer of risk, HUD warned that "[t]he reinsurance transaction cannot be a sham under which premium payments . . . are given to the reinsurer even though there is no reasonable expectation that the reinsurer will ever have to pay claims."  *Id.* at 6.

50.     The HUD Letter also states that "[t]his requirement for a real transfer of risk would clearly be satisfied by a quota share arrangement" provided that "the reinsurer is bound to participate pro rata in every claim."  *Id.*

51.     The HUD Letter states that excess-of-loss private mortgage reinsurance contracts can escape characterization as an unlawful referral fee or fee-split ***only if***:

> [T]he band of the reinsurer's potential exposure is such that a reasonable business justification would motivate a decision to reinsure that band.  Unless there is a real transfer of risk, no real reinsurance services are actually being provided.  In either case, the premiums paid . . . must be commensurate with the risk.

*Id.* at 3.

52.     In other words, even if there is some transfer of risk, the reinsurance arrangement will still violate RESPA if the amount paid (*e.g.*, the premiums ceded) is not commensurate with

the risk transferred.[6]

**D.    Regulatory, Accounting and Actuarial Standards Require Real Risk Transfer and a Reasonable Possibility of Significant Loss in Private Mortgage Reinsurance**

53.    Accepted accounting and actuarial principles determine whether a reinsurance arrangement, like those at issue here, represents a "real transfer of risk," including for purposes of RESPA.  These principles provide that, for a contract to be treated as real reinsurance, the reinsurer must assume significant insurance risk and it must be "reasonably possible that the reinsurer may realize a significant loss."  *See* Exhibit 14 hereto (CAS Research Working Party on Risk Transfer Testing, Risk Transfer Testing of Reinsurance Contracts: Analysis and Recommendations, Casualty Actuarial Society Forum, Winter 2006, at 282-283); *see generally* Exhibit 15 hereto (Statement of Financial Accounting Standards No. 113, "Accounting and Reporting for Reinsurance of Short-Duration and Long-Duration Contracts," at 7 (December 1992)).  As alleged in this section, the reinsurance arrangements at issue in this action violated RESPA because they foreclosed the reasonable possibility that Cross Country "may realize a significant loss."

54.    Insurers and reinsurers are subject to two sets of accounting standards in the United States: "(1) statutory accounting principles ("SAP") and (2) generally accepted accounting principles ("GAAP")."  *See* Exhibit 16 hereto (Robert W. Klein & Shaun Wang, *Catastrophe Risk Financing in the US and the EU: A Comparative Analysis of Alternative Regulatory Approaches*, The Journal of Risk and Insurance, 2009, Vol. 76, No. 3, 609).  SAP rules are determined by state insurance regulators through the NAIC, and insurers are required to

---

[6]       As alleged above, RESPA is now administered and enforced by the CFPB.  The industry publication *American Banker* reported in 2012 that the CFPB has launched an investigation into "private mortgage lender and servicer" PHH Corporation's alleged kickback scheme—the same type of scheme described herein.  The investigation is the CFPB's first known formal investigation of any kind.  *See* Exhibit 13 hereto (Jeff Horwitz, *PHH Targeted by CFPB in Reinsurance Kickback Probe,* American Banker (Jan. 10, 2012, 4:31 PM), http://www.americanbanker.com/issues/177_7/phh-cfpb-reinsurance-1045593-1.html).

file detailed financial statements and other reports in accordance with SAP.  *Id.*  GAAP rules are "determined by the Financial Accounting Standards Board ("FASB"), and insurers are required to follow GAAP in their non-regulatory financial statements and Securities and Exchange Commission ("SEC") reports."  *Id.*

55.     FASB 113 or "FAS 113" was "implemented in 1993 to prevent, among other things, abuses in GAAP accounting for contracts [such as the ones at issue in this litigation] that have the formal appearance of reinsurance but do not transfer significant insurance risk and thus should not be eligible for reinsurance accounting.  SSAP 62 [or SAP 62, now SAP 62R], which largely incorporates the same language as FAS 113, was implemented shortly thereafter to address the same issues with respect to statutory accounting."  *See* Exhibit 14, at 282-83.

56.     Under FAS 113, "in order for a contract to qualify for reinsurance accounting treatment [as real, risk-transferring reinsurance] . . . it must transfer insurance risk from an insurer to a reinsurer.  To meet the risk transfer requirement, a reinsurance contract must satisfy one of two conditions:

> 1.   It must be evident that 'the reinsurer has assumed substantially all of the insurance risk relating to the reinsured portion of the underlying insurance contracts' (paragraph 11), or
>
> 2.   The reinsurer must 'assume significant insurance risk under the reinsured portions of the underlying insurance contracts' (paragraph 9a) and it must be 'reasonably possible that the reinsurer may realize a significant loss from the transaction' (paragraph 9b)."

*Id*. at 283; *see generally* Exhibit 15, at 7.

57.     In other words, real transfer of insurance risk is passed to a reinsurer only if: (i) the reinsurer assumes ***significant*** insurance risk under the reinsured portions of the underlying

reinsurance contracts; and (ii) it is reasonably possible that the reinsurer may realize a significant loss from the transaction.  *Id*.

58.     Further, FAS 113 provides the following blueprint for how to perform a "real risk transfer" analysis:

> The ceding enterprises' evaluation of whether it is reasonably possible for a reinsurer to realize a significant loss from the transaction shall be based on the present value of all cash flows between the ceding and assuming enterprises under reasonably possible outcomes, without regard to how the individual cash flows are characterized.  The same interest rate shall be used to compute the present value of cash flows for each reasonably possible outcome tested.

> Significance of loss shall be evaluated by comparing the present value of all cash flows . . . with the present value of the amounts paid . . . to the reinsurer.

*Id.*

59.     SSAP 62R's test for whether a reinsurance contract effectuates a real risk transfer is substantively identical:[7]

> a.     The reinsurer assumes significant insurance risk under the reinsured portions of the underlying insurance agreements; and

> b.     It is reasonably possible that the reinsurer may realize a significant loss from the transaction.

*See* Exhibit 18 hereto (NAIC Accounting Practices & Procedures Manual, March 2010, Statement of Statutory Accounting Principles No. 62R, Property and Casualty Reinsurance, Ex. A "Implementation Questions and Answers," at paragraph 13, SAP 62R-6).[8]

---

[7]     "The above provisions of SSAP 62 [now SAP 62R] are essentially the same as those in FAS 113."  *See* Exhibit 17 hereto (American Academy of Actuaries, Committee on Property and Liability Financial Reporting, Risk Transfer in P&C Reinsurance: Report to the Casualty Actuarial Task Force of the National Association of Insurance Commissioners, August 2005), at 6.

[8]     *See also id.* at paragraph 15, 62R-6 ("The ceding entity's evaluation of whether it is reasonably possible for a reinsurer to realize a significant loss from the transaction shall be based on the present value of all cash flows between the ceding and assuming companies under reasonably possible outcomes . . . . An outcome is reasonably

60.     Reinsurance "[c]ontracts that do not result in the reasonable possibility that the reinsurer may realize a significant loss from the insurance risk assumed generally do not meet the conditions for reinsurance accounting and are to be accounted for as deposits."  *See* Exhibit 15, at 4; *see generally* Exhibit 19 hereto (Section AICPA Technical Practice Aids, Section 10,760, Statement of Position 98-7 Deposit Accounting: Accounting for Insurance and Reinsurance Contracts that Do Not Transfer Insurance Risk, October 19, 1998).

61.     In a deposit accounting/no-risk transfer arrangement, payment from a reinsurance trust to a primary insured may be a "loss" to the primary insurer, ***but not the reinsurer***—it is akin to a withdrawal from a traditional bank savings account.  Payment of "claims" under a deposit accounting "reinsurance" arrangement is specifically anticipated, and accounting for such payments (versus payments made under "real," risk-transferring reinsurance contracts) is subject to a set of rules different from those that apply to true reinsurance.  *See* Exhibit 18 at paragraph 35, SAP 62R-11 at (b) (referencing "disbursements"), (e) (referencing "settlement of losses"), and (f) (referencing loss and loss adjustment expense in these types of "non" risk transfer contracts); *see also* Exhibit 20 hereto (superseding SSAP No. 75, amending SSAP No. 62R, paragraph 3, at 75-3 paragraph (b), referencing "disbursements," paragraph (d), referencing "settlement of losses," and paragraph (e), referencing loss and loss adjustment expense).

62.     In addition, at least one state regulator has explicitly concluded that no real transfer of risk exists where reinsurance agreements include liability limiting provisions or lack sufficient recourse provisions to ensure that the reinsurer lives up to its commitments.   In particular, the State of Arizona Department of Insurance has made clear its view that mortgage reinsurance arrangements including any of the following characteristics ***result in "insufficient risk transfer" and should be accounted for under "deposit accounting guidelines***":

---

possible if its probability is more than remote.").

- where there are unusual termination provisions, such as provisions for automatic termination and recapture by the ceding mortgage insurer with no further liability to the reinsurer, in the event the reinsurer fails to adequately fund the reinsurance treaty trust account;

- where the reinsurer shall have no liability to the ceding insurer in the event the assets in the trust account are insufficient to pay any amounts then due and payable by the reinsurer; or

- where the ceding company shall have no recourse against the reinsurer or its assets other than the trust funds.

*See* Exhibit 21 hereto (Department of Insurance, State of Arizona, Supplemental Schedule F-5 for Mortgage Guaranty Insurers that Cede to Captive and/or Unauthorized Reinsurers) (emphasis added).

63.    In sum, under the foregoing principles, a purported reinsurance arrangement for private mortgage insurance—quota share or excess-of-loss—does not constitute real reinsurance if:  (i) the reinsurance contract limits the reinsurer's liability to pay claims to the amount of assets held in the trust accounts established for each mortgage insurer and into which the mortgage insurer deposits the ceded portion of the premium collected from borrowers; (ii) the reinsurer puts no or merely nominal amounts of its own capital into the trust accounts; and (iii) the private mortgage insurer has no recourse against the reinsurer.  Indeed, as noted by the American Academy of Actuaries:

> Straight quota share contracts are typically exempted from risk transfer requirements under the paragraph 11 exception of FAS 113.  However, the ***introduction of risk limiting features to a quota share contract, such as a loss ratio cap . . .*** a loss retention corridor, or a sliding scale commission, often prevents the contract from qualifying for the exception.

*See* Exhibit 22 hereto (January 2007 Reinsurance Attestation Supplement 20-1, at 14) (emphasis added).   Similarly, for a private mortgage insurance reinsurer subject to an excess-of-loss contract to be exposed to any real losses (as opposed to merely paying claims from ceded premiums), two circumstances must exist:  (i) the amount of losses paid by the private mortgage

insurer must reach the band where the reinsurer's responsibility to pay claims attaches; and (ii) the reinsurance agreement between the reinsurer and the private mortgage insurer must contain provisions *requiring* the reinsurer to contribute its *own* capital to pay its share of losses when called upon by the primary private mortgage insurer.

64.     In contrast, a reinsurance arrangement between a reinsurer and a private mortgage insurer that does not expose the reinsurer to any real possibility that it may be required to contribute its own money—and thereby experience real insurance "losses"—when called upon to pay claims by the private mortgage insurer, does not constitute actual risk-transferring reinsurance, but is a sham which contravenes RESPA.  As alleged below, Cross Country's agreements with the Private Mortgage Insurers did not involve an actual or commensurate transfer of risk, and the ceded premiums paid pursuant thereto were therefore kickbacks and referral payments that violated RESPA.

**E.     JPMorgan's Captive Reinsurance Arrangements with the Private Mortgage Insurers Violated RESPA**

65.     During the Class Period, in connection with the home loans originated, funded and/or originated through correspondent lending by JPMorgan, many of JPMorgan's borrowers paid for private mortgage insurance.

66.     Also during the Class Period, Cross Country was a party to captive reinsurance arrangements with Private Mortgage Insurers that violated RESPA's kickback and improper fees provisions.  Pursuant to these virtually identical arrangements, JPMorgan referred borrowers to the Private Mortgage Insurers who, for their part, agreed to reinsure with Cross Country under carefully crafted reinsurance contracts that provided for no true transfer of risk of reinsurance losses to Cross Country.  JPMorgan allocated its referrals of borrowers to the Private Mortgage Insurers on a systematic, rotating basis which was divorced from quality of service, price,

reputation, performance or any other appropriate, objective metric for selecting among the Private Mortgage Insurers.   Defendants' coordinated actions reduced competition in the mortgage insurance market and increased premiums for Plaintiffs and the Class in violation of RESPA.   *See generally* 12 U.S.C. § 2601(b).   In this action, Plaintiffs are not, however, challenging the insurance rates they paid for their individual private mortgage insurance policies.

67.   Cross Country entered into reinsurance contracts with each Private Mortgage Insurers solely with respect to loans originated, funded, and/or originated through correspondent lending by JPMorgan during the Class Period.   *Cf.* Exhibit 23 hereto (excerpt from "Investment in Subsidiaries and Equities, Comptroller's Licensing Manual," Washington, D.C., July 2008, at 11, 63).   Such agreements were in the form of purported aggregate excess-of-loss reinsurance contracts or quota share reinsurance contracts.

68.   Under each of JPMorgan's captive reinsurance arrangements, the Private Mortgage Insurer paid and continues to pay Cross Country a percentage of the premiums (upon information and belief, up to 40 percent of the premium) paid by borrowers on a particular pool of loans.   In return, Cross Country purportedly agreed and continues to agree to assume a portion of the insurer's risk of loss with respect to the loans involved.

69.   Under its purported reinsurance contracts, Cross Country established a separate trust for each Private Mortgage Insurer into which the Private Mortgage Insurer deposited the contractually-determined ceded portions of the premiums that it collected from JPMorgan borrowers on the particular pool of loans at issue.   Each trust account supported a reinsurance contract between Cross Country and the insurer—that is, it held the funds that were to be used under the reinsurance contract to pay claims on the pool of loans at issue.

70.     Premiums were ceded into the supporting trusts on a "book year" basis, as described by an American Institute of CPAs ("AICPA") Task Force addressing issues regarding risk transfer in mortgage reinsurance captive arrangements:

> A contract functions at the book year level and is typically for a 10 year term.  For example, 1999 is a book year and all mortgage insurance policies written during 1999 would be considered "book year 1" and reinsurance premium and reinsurance losses related to that book year would be ceded to the captive reinsurer for 10 years . . . .  Trust funds for all book years for the particular MI cross-collateralize the entire reinsured obligation to the MI.

*See* Exhibit 24 hereto (Proposed EITF Issue titled "Risk Transfer in Mortgage Reinsurance Captive Arrangements"), at 3.

71.     Thus, all claims under JPMorgan's contract with a particular Private Mortgage Insurer could be satisfied from all of the funds in the trust created to support that reinsurance contract, rather than only from premiums ceded for a given book year.  *Id.*

72.     Moreover, upon information and belief, when certain trust reserve requirements were met, the funds in the trust were released to Cross Country, and up through to its parent, JPMorgan, as premium income.   Thus, the ceded private mortgage insurance premiums deposited into the trusts remain there until they are paid out to cover claims or to cover administrative expenses, or released to Cross Country and ultimately, JPMorgan.

73.     In addition, upon information and belief, JPMorgan's contracts with the Private Mortgage Insurers were designed to limit JPMorgan and Cross Country's liability or payment responsibilities under the contracts through provisions that permitted Cross Country to effectively opt out of the contracts at will by simply failing to adequately capitalize the trust supporting any reinsurance contract.

74.     As the industry publication *American Banker* aptly described such arrangements:

> And the deals were "self-capitalizing," meaning that a bank could fund its stake with incoming premiums.  If the deal went bad, the bank could walk away and leave the insurer to cover its losses.  Conceptually, such arrangements are analogous to letting a gambler with $10 in casino chips place a $100 bet at a blackjack table on the assumption that he'll win.

*See* Ex. 1 (Reinsurance Kickbacks).

75.     In other words, if JPMorgan elected not to maintain the required funds in a trust on behalf of Cross Country, once the trust was depleted, Cross Country bore no further risk and the mortgage insurer assumed any remaining obligations, no matter if the funds in the trusts were insufficient to cover the amount of "losses" the captive reinsurer had contracted, and been paid, to cover.  The absence of such recourse distinguishes JPMorgan's RESPA-violating captive reinsurance contracts from true mortgage reinsurance contracts.

76.     Cross Country was facially required, pursuant to its contracts with the Private Mortgage Insurers, to maintain through, *inter alia*, capital infusions and ceded premiums, each trust fund's net assets at a level required by state law to fund claims made under the reinsurance contracts.  However, also under the reinsurance contracts, Cross Country's potential exposure for payment of reinsurance claims is limited to the amount held in the trust account established for each Private Mortgage Insurer, and funded by premiums ceded by the respective Private Mortgage Insurer.  This effectively insulates Cross Country from liability for failing to maintain the trusts at a level sufficient to pay claims and leaves the Private Mortgage Insurers with no recourse to Cross Country.

77.     Consequently, Defendants' captive reinsurance arrangements do not constitute real, risk-transferring reinsurance between Cross Country and the Private Mortgage Insurers in light of the standards set forth in ¶¶ 54-64 above.  Instead, they violate RESPA.

78.     As HUD noted during testimony by its Deputy Assistant Secretary for Regulatory Affairs and Manufactured Housing, Gary M. Cunningham, before the United States Congress (referring to analogous captive reinsurance arrangements in the title insurance industry):

> [W]hen there is a history of little or no claims being paid, or the premium payments to the captive reinsurer far exceed the risk borne by the reinsurer, there is strong evidence that there is an arrangement constructed for the purpose of payment of referral fees or other things of value in violation of Section 8 of RESPA.

*See* Exhibit 25 hereto (April 26, 2006 testimony of Gary M. Cunningham).

79.     Such is the case with JPMorgan.  As reflected in the table below, which is based on figures obtained from a review of Schedule F – Part 3 of the Annual Statements for the Private Mortgage Insurers filed with the NAIC for the years 2005 through 2012 (where available), from the beginning of 2005 through the end of 2012, Cross Country collected from the Private Mortgage Insurers over *$676 million* in ceded private mortgage insurance premiums related to JPMorgan borrowers while paying approximately *$142 million* toward purported reinsurance claims on the same pool of policies during this time period:

| YEAR | PREMIUMS RECEIVED | CLAIMS PAID |
|---|---|---|
| 2012 | $38,367,000 | $16,828,000 |
| 2011 | $65,903,000 | $19,439,000 |
| 2010 | $86,913,000 | $69,548,000 |
| 2009 | $87,693,000 | $29,539,000 |
| 2008 | $103,816,000 | $3,854,000 |

| 2007 | $75,375,000 | $1,872,000 |
|---|---|---|
| 2006 | $75,971,000 | $1,193,000 |
| 2005 | $74,962,000 | $222,000 |
| 2004 | $67,962,000 | $200,000 |
| **TOTAL:** | $676,962,000 | $142,695,000 |

80.     If nothing else, the above table demonstrates that even during the pendency of the largest real estate collapse in our Country's history, Cross Country continued to make a disproportionate profit as compared to the claims it was required to "pay."

81.     Importantly, the mere fact that Cross Country paid claims from the trust accounts does not establish that the underlying reinsurance contracts constitute real, risk-transferring and commensurately priced reinsurance as required by RESPA.   Instead, upon information and belief, even after paying some claims, due to the structure of the reinsurance agreements, Cross Country continued to carry no true risk of loss, as defined in the applicable standards and regulations addressed above in ¶¶ 54-64, and the premiums received by Cross Country were not commensurate to any risk that Cross Country purportedly assumed.

82.     As set forth above at ¶¶ 54-64, there is no "real transfer of risk" in a reinsurance transaction, and the transaction is a "sham," if it is one "under which premium payments . . . are given to the reinsurer even though there is no reasonable expectation that the reinsurer will ever have to pay claims."   *See* Ex. 12 (HUD Letter) (emphasis added).   It is the possibility that the reinsurer will be required ***to pay claims using its own capital*** (as opposed to paying claims using

only ceded premiums in a reinsurance trust) that is necessary to establish a true transfer of risk in the reinsurance setting.  *See* ¶¶ 54-64.  Thus, in the circumstances of this action, the mere payment of a claim from the Cross Country reinsurance trusts—which were primarily or entirely funded by premiums ceded by the Private Mortgage Insurers—would not establish that Cross Country itself had paid such claim.  Rather, claims payments from these trusts were funded in the first instance by ceded premiums, and Cross Country would be exposed to actual risk—*i.e.*, would pay claims from its own capital—if ever, only after the ceded premiums in the trusts were exhausted.

83.     Therefore, the payments of claims from the reinsurance trusts maintained by Cross Country to the Private Mortgage Insurers do not constitute "losses" to Cross Country and do not establish a true transfer of risk from the Private Mortgage Insurers to Cross Country, because, upon information and belief, under the terms of the underlying agreements, Cross Country will either:  (i) receive more in premiums from the Private Mortgage Insurers than the trusts will ever transfer to the Private Mortgage Insurers in purported reinsurance claims; or (ii) have the option to walk away from its purported reinsurance obligations if it is called upon to pay more in claims than is available in the trust accounts.  The premiums ceded from the Private Mortgage Insurers and deposited into the trust accounts effectively constitute the only funds available to cover reinsurance claims payments.  To the extent, then, that claims have been paid from the reinsurance trusts under Cross Country's arrangements with the Private Mortgage Insurers, the payment of such claims does not establish that JPMorgan has suffered a true reinsurance "loss," nor does it establish a *bona fide* risk-transferring reinsurance arrangement wherein the compensation paid was commensurate with the value of the services provided.  Instead, no real risk was transferred or assumed.   In fact, the structure of the reinsurance

contracts themselves and their missing essential terms negate any exposure to reinsurance losses, rendering the arrangements a sham.

84.     The over **$676 million** in "reinsurance" premiums paid by the Private Mortgage Insurers and collected by JPMorgan through its captive reinsurer Cross Country from 2005-2012 have not been commensurate with Cross Country's actual risk exposure.  Cross Country received this amount while bearing little or no risk of loss.

85.     The money that JPMorgan collected from the Private Mortgage Insurers through Cross Country far exceeded the value of the services, if any, that Cross Country performed or provided.  There was no real transfer of risk or, at least, not a commensurate transfer of risk given the vast disproportion between the amount of premiums ceded to Cross Country and the contractual limits on Cross Country's actual obligations.  Instead, the amounts paid to Cross Country were simply disguised kickbacks and unearned fees to JPMorgan for the referral of borrowers to the Private Mortgage Insurers.

86.     Every premium already ceded to Cross Country by the Private Mortgage Insurers, as well as every premium that they will continue to cede to Cross Country in the future, constitutes a separate illegal kickback and/or referral fee split "incident to or part of a real estate settlement service involving a federally related mortgage loan" in violation of RESPA, 12 U.S.C. § 2607(a).  Each such payment—past, present and future—represents a violation of RESPA on the part of each of the Defendants.

87.     These arrangements keep premiums for private mortgage insurance artificially inflated because a percentage of borrowers' premiums are not being paid to cover actual risk, but are simply funding illegal kickbacks to lenders.  In other words, because the money collected by a lender through its captive reinsurer comes from borrowers' mortgage insurance premiums,

29

borrowers are essentially required to pay for *both* actual private mortgage insurance coverage *and* private mortgage insurers' unlawful kickbacks to lenders.

88.    Amounts paid to lenders as unlawful kickbacks secretly became a part of the cost of doing business for consumers required to purchase private mortgage insurance.  As a result, private mortgage insurance premiums incorporated and continue to include the payment of such kickbacks—to the detriment of consumers.  This is exactly the sort of practice and consequence that RESPA was designed to prevent.

89.    Notably, Defendants' arrangement involving unlawful kickbacks and fee payments occurred against a backdrop of widespread, similar unlawful practices in the settlement services industry that has recently received regulatory and press attention.

90.    In particular, the CFPB is currently engaged in an industry-wide investigation of captive reinsurance of private mortgage insurance, including major lenders and all private mortgage insurance providers.  The CFPB has issued subpoenas and civil investigative demands to significant participants in furtherance of its investigation into this nationwide practice.[9]  The CFPB's investigation is ongoing and is likely to spawn further discovery demands.

91.    The CFPB's efforts to turn up the heat on the practices alleged herein have also yielded results.  In April of 2013, the CFPB filed four separate enforcement actions in the District Court for the Southern District of Florida against four of the largest mortgage insurers in the country.  All four insurers promptly agreed to the entry of consent orders against them which (1) prohibits the future practice of illegal kickbacks, (2) requires compliance monitoring and reporting, and (3) levies a multimillion dollar penalty against each private mortgage insurer.  *See*

---

[9]    *See, e.g.,* Exhibit 26 hereto (Maya Jackson Randall, *Consumer Bureau Sets Mortgage-Insurer Probe,* Wall Street Journal (Aug. 5, 2012), http://online.wsj.com/article/SB10000872396390444246904577571753451048664. html); Exhibit 27 hereto (Daniel Wagner, *Mortgage Insurance Investigated for Possible Kickback Deals,* USA Today (Aug. 3, 2012), http://www.usatoday.com/money/industries/banking/story/2012-08-03/consumer-probe-mortgage-ins).

Final Consent Judgment and Order, *CFPB v. Genworth Mortg. Ins. Corp.*, No. 1:13-cv-21183 (S.D. Fla. Apr. 5, 2013) attached hereto as Exhibit 28; Final Consent Judgment and Order, *CFPB v. Mortgage Guar. Ins. Corp.*, No. 1:13-cv-21187 (S.D. Fla. Apr. 5, 2013) attached hereto as Exhibit 29; Final Consent Judgment and Order, *CFPB v. United Guaranty Corp.*, No. 1:13-cv-21189 (S.D. Fla. Apr. 5, 2013) attached hereto as Exhibit 30; Final Consent Judgment and Order, *CFPB v. Radian Guaranty, Inc.*, No. 1:13-cv-21188 (S.D. Fla. Apr. 9, 2013) attached hereto as Exhibit 31.

92.     In a press release, the CFPB announced:

> We believe these mortgage insurance companies funneled millions of dollars to mortgage lenders for well over a decade. The orders announced today put an end to these types of arrangements and require these insurers to pay more than $15 million in penalties for violating the law.

Press Release, CFPB, Consumer Financial Protection Bureau Takes Action Against Mortgage Insurers To End Kickbacks To Lenders (Apr. 4, 2013), attached hereto as Exhibit 32.

93.     Milliman, as identified in ¶ 43, actively promoted the establishment of lender captive mortgage reinsurance entities as a money-making enterprise for mortgage lenders. *See* Ex. 3. As Milliman acknowledged, if everything went as planned, the scheme would operate as a perfect kickback: "[i]f actual losses develop to the expected level, the above arrangement, from the lender's perspective, is financially equivalent to receiving a commission or profit sharing equal to a percentage of premium." *See id.*

94.     Milliman was correct: upon information and belief, under the terms of the virtually identical reinsurance contracts entered into between the private mortgage insurers and each of the top lender captive reinsurers in the country, and like the JPMorgan contracts alleged herein, the lenders were protected from any liability beyond any initial nominal capital infusion and bore no real risk. Most significantly, each of these reinsurance contracts contained

"termination clauses" and "trust caps" which, without a counter-balancing "recourse" provision vis-à-vis the parent lender to ensure that the private mortgage insurance reinsured through termination would indeed continue to reinsured, effectively allowed the reinsurer to opt out of the scheme at its discretion and without suffering adverse consequences.  For instance, in a suit against Wells Fargo & Company, Wells Fargo Bank, N.A. and North Star Mortgage Guaranty Reinsurance Company (collectively, "Wells Fargo"), involving claims similar to those alleged here, Wells Fargo provided the court with copies of contracts that its captive reinsurer entered into with two of the Private Mortgage Insurers, Republic and Radian.  Each of these contracts includes a provision limiting Wells Fargo's exposure to risk.  *See* Revised Reinsurance Agreement (Excess Layer) between Republic Mortgage Insurance Company and North Star Mortgage Guaranty Reinsurance Company, dated Mar. 12, 2001, attached hereto as Exhibit 33, at Section 9.03 and Section 12.07; Reinsurance Agreement (Excess Layer) between Radian Guaranty, Inc. and North Star Mortgage Guaranty Reinsurance Company, dated March 1, 2000, attached hereto as Exhibit 34, at Section 9.03, Section 12.06; Amendment Dated March 29, 2000 to Reinsurance Agreement (Excess Layer) between Radian Guaranty Inc. and North Star Mortgage Guaranty Reinsurance Company at Section 12.11, attached hereto as Exhibit 35.

95.     When asked to opine on contracts like those cited above with non-recourse and liability-limiting provisions in *Moore v. GMAC Mortg., LLC*, No. 07-cv-04296 (E.D. Pa.), Andrew Barile, a noted reinsurance industry expert, stated that he had never, "in all [his] years of experience," seen reinsurance agreements with non-recourse/trust cap terms similar to those in the reinsurance agreements between the lender captive reinsurer and the private mortgage insurers.  *See* Defendants' Reply In Support of Motion to Compel Plaintiffs' Experts to Produce

Documents at 7, *Moore v. GMAC Mortg., LLC*, No. 07-cv-04296 (E.D. Pa. Oct. 12, 2010), ECF No. 144.

96.     Moreover, in other cases challenging the same type of agreement or understanding as is alleged herein against JPMorgan, lenders have conceded that a borrower's private mortgage insurer is selected on a rotating or similar basis.  For instance, in a case brought against Countrywide Financial Corporation, its mortgage lender and its captive reinsurer, the Third Circuit noted:

> Countrywide generally requires borrowers who do not put twenty percent down when buying a home to purchase PMI from one of seven (now six) PMI providers.  The borrower pays the PMI premiums, even though the mortgage lender is the beneficiary of the policy, and generally has no opportunity to comparison-shop for PMI lenders.  Instead, the PMI provider is selected by the lender, here on a rotating basis among the seven providers, all of whom had allegedly agreed with Countrywide to reinsure with Balboa.

*Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, n.3 (3d Cir. 2009).  *See also* Transcript of Class Certification Hearing at 11-13, *Moore*, No. 07-cv-04296 (Mar. 2, 2010), attached hereto as Exhibit 36 (acknowledging that the assignment of borrowers to the private mortgage insurers was done on a rotating basis).

97.     Defendants, along with other lenders, their captive reinsurers, and the Private Mortgage Insurers involved in similar agreements or understandings, continued their conduct in violation of RESPA through at least 2008.  Defendants only started "applying the brakes" to this ongoing activity after it became less profitable due to the Federal Home Loan Mortgage's ("Freddie Mac") decision that, effective June 1, 2008, it would limit the percentage of premiums a mortgage insurance provider could cede to a lender's captive reinsurer to 25%.  This limitation contributed to a decline in profits for JPMorgan, who, upon information and belief, was receiving a much higher percentage of ceded premiums until that point in time.

98.     This declaration came after years of Freddie Mac and the Federal National Mortgage Association ("Fannie Mae") requiring that Private Mortgage Insurers obtain and maintain approval as "qualified mortgage insurers" for the purposes of providing insurance coverage that is obtained by others on loans subsequently acquired by Freddie Mac and Fannie Mae.  *See* Fannie Mae Qualified Mortgage Insurer Approval Requirements (December 2003), ("Approval Requirements") attached as Exhibit 37; Freddie Mac Private Mortgage Insurer Eligibility Requirements (March 2002) ("Eligibility Requirements") attached as Exhibit 38. Under the Approval and Eligibility Requirements, qualified mortgage insurers must, *inter alia*: (1) retain an independent actuarial opinion for each captive reinsurance agreement that finds the provisions of the agreement satisfy the risk transfer provisions of FASB 113, and the ceded premium is commensurate with the ceded risk; and (2) certify annually that they are in compliance with the Approval Requirements.  Exhibit 37, at 10, 12; Exhibit 38, at 19, 24.

99.     Private mortgage reinsurance kickback schemes such as the one alleged herein keep premiums for private mortgage insurance artificially inflated because a percentage of borrowers' premiums are not being paid to cover actual risk, but are simply funding illegal kickbacks to lenders.  In other words, because the money collected by a lender through its captive reinsurer comes from borrowers' mortgage insurance premiums, borrowers are essentially required to pay for **both** actual private mortgage insurance coverage and private mortgage insurers' unlawful kickbacks to lenders.

## TOLLING OF THE STATUTE OF LIMITATIONS

100.     Prior to and throughout the Class Period, Defendants participated in and were parties to an agreement or understanding that was, by its very nature and purposeful design, a "pay to play" scheme.  Through this agreement or understanding, Defendants continually

violated RESPA through an arrangement with the Private Mortgage Insurers that funneled kickbacks to Cross Country that were payments for Defendants' referral of mortgage insurance business rather than for services that Cross Country was to perform or actually performed.

101.   Defendants affirmatively acted to mislead Plaintiffs by making false and misleading representations in order to conceal these violations from Plaintiffs and prevent Plaintiffs and the other members of the putative Class from discovering the underlying basis for their claims despite the exercise of due diligence.   Each of these acts and misrepresentations are distinct from and subsequent to the underlying violations asserted herein.

102.   In fact, CFPB director Richard Cordray recently remarked in announcing the assessment of monetary penalties upon certain mortgage insurers based upon their participation in captive reinsurance arrangements: "Homeownership is difficult and expensive enough for most people without extra costs imposed by financial kickbacks that *are kept hidden from them*."  *See* Exhibit 32.

103.   This complex action is dissimilar to a comparatively simple RESPA case in which, for example, a borrower may determine—from examining his or her HUD-1 settlement statement—that he or she was overcharged for a settlement service or that too much money is being paid to his or her lender, real estate agent, title insurer or other settlement service provider. Rather, Defendants specifically misrepresented to and assured Plaintiffs and other Class members that Defendants' captive reinsurance arrangements would have *no practical impact* upon Plaintiffs' interests or rights.

104.   All Defendants also participated in a scheme to conceal their collective violations of RESPA's anti-kickback provisions.   Accordingly, the affirmative acts and misrepresentations of each Defendant not only misled Plaintiffs and concealed the violations of that particular

Defendant through the scheme, but also concealed the violations of each of the other Defendants participating in the scheme.  Thus, the acts and misrepresentations of each Defendant prevented Plaintiffs from discovering the possible basis for their claims against all Defendants participating in the scheme.

105.    For these reasons, the statutes of limitation applicable to the claims asserted herein should be tolled based upon the principles of equitable tolling.  Any delay by Plaintiffs or the other members of the putative Class in commencing litigation is excusable and, accordingly, it would be inequitable for the Court to apply the one-year limitation period set forth in RESPA Section 16, 12 U.S.C. § 2614 in a way that would preclude the claim of any Class member.  For Plaintiffs and other putative Class members, equitable tolling is available and should apply.

106.    To start, Defendants engaged in numerous affirmative acts and made false and/or misleading representations about the captive reinsurance arrangements to conceal the facts and circumstances giving rise to the claims asserted herein.  These affirmative acts included, *inter alia*:  (i) using misleading form mortgage documents and affiliated business arrangements to:  (a) lull borrowers into inaction, (b) misrepresenting and concealing the nature of the reinsurance arrangements, (c) misrepresenting and concealing the relationship of the parties thereto, and (d) concealing information about those parties from Plaintiff; (ii) concealing and/or misrepresenting information regarding the true nature and purpose of the agreement or understanding alleged herein; (iii) intentionally providing incomplete, inaccurate and/or misleading information to Plaintiffs and to the other members of the putative Class; and (iv) providing incomplete and/or inaccurate information to regulators and analysts.  Again, these affirmative acts were separate and distinct from Defendants' conduct that violated RESPA, and these separate and distinct acts

were undertaken by Defendants to conceal those violations.[21]

107.    For example, the form mortgage document (the "Mortgage Document") presented to Plaintiffs and each member of the class stated, in relevant part:

> . . . Borrower is not a party to the Mortgage Insurance.
>
> Mortgage insurers evaluate their total risk on all such insurance in force from time to time and may enter into agreements with other parties that share or modify their risk, or reduce losses….
>
> As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity or any affiliate of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of the Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance."  Further:
>
> **(a) Any such arrangements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan.  Such agreements will not increase the amount Borrower will owe for Mortgage Insurance**….
>
> **(b)  Any such agreements will not affect the rights Borrower has—if any— with respect to the Mortgage Insurance**….

*See, e.g.*, Exhibit 3, hereto (the Blake Mortgage Document) (bold emphasis in original).  In fact, this provision concerning the non-effect of the purported captive reinsurance on borrowers is one of only two bolded provisions in the entire Mortgage Document.

108.    In addition, borrowers also received a "Mortgage Guaranty Insurance Disclosure" (the "MI Document") that stated:

---

[21]    As *American Banker* reported, "making matters worse, banks allegedly forced unknowing consumers to buy more insurance than they needed *and failed to properly disclose the reinsurance contracts*, another RESPA violation." Ex. 1 (Reinsurance Kickbacks) (emphasis added).  In fact, HUD investigators reported to the DOJ that "[m]ost of the time, lenders did not tell borrowers in advance that their captives were reinsuring the deals . . . [i]n some cases, banks allegedly told customers that the charge for the reinsurance was 'none.'"  *Id.*

The insurance company may ask another insurance company to assume some or all of the risk under the insurance policy in exchange for a portion of the insurance premium. This is called "reinsurance" and may result in a financial gain to the company providing the reinsurance. Chase has an affiliate, Cross Country Insurance Company, that provides reinsurance to mortgage guaranty insurance companies; however, **a reinsurance arrangement with Chase will not change my mortgage guaranty insurance premiums**.

*See, e.g.*, Exhibit 39 (Blake MI Document) (bold in original).

109.    Both the Mortgage Document and MI Document therefore affirmatively misrepresent to borrowers that the captive reinsurance arrangements provided real reinsurance and involved an assumption of risk by another company, *i.e.*, Cross Country, whose identity was not even disclosed in the Mortgage Document.  For instance, while Defendants represented to Plaintiffs that the purpose of the captive reinsurance arrangement was to "***share or modify their risk"*** and/or "***reduce losses***" associated with Plaintiffs' mortgage and that such an arrangement represented *bona fide* reinsurance, ***no*** real or significant risk was transferred.  Defendants' misrepresentations about the legitimacy of their captive reinsurance arrangements in standardized mortgage and closing documents are acts of concealment separate and distinct from Defendants' RESPA violations, and these independent acts misled Plaintiffs and other members of the putative Class.

110.    Critically, both the Mortgage Document and MI Document contain express language affirmatively misrepresenting to borrowers that the captive reinsurance arrangement would have ***no practical impact*** upon Plaintiffs' rights or interests, thereby eliminating any cause for concern or need for further investigation on the part of the borrower.  As with the Mortgage Document, the MI Document reassures all borrowers that the existence of a reinsurance agreement **"will not change my mortgage guaranty insurance premiums."**  *See, e.g.*, Ex. 39.

111.    Upon information and belief, the aforementioned language in the various disclosures was intentionally designed to lull Plaintiffs and other members of the Class into

believing that any reinsurance of their PMI would have no appreciable impact upon their interests, as Defendants affirmatively misrepresented that any reinsurance would not affect the borrower's: (i) costs with respect to mortgage insurance; (ii) rights or entitlements with respect to mortgage insurance; or (iii) loan terms. Instead, the Mortgage Document and the MI Document portray the potential reinsurance of a borrower's mortgage insurance as an insurance business transaction with which a borrower—"*not a party to the Mortgage Insurance*"—had no practical reason to be concerned. Defendants thus lulled Plaintiffs into inaction with respect to the possible reinsurance of their PMI.

112. Further, Defendants affirmatively misrepresented that the placement of a borrower's loan in the reinsurance program would not increase his premiums. The Mortgage Document affirmatively states that any PMI reinsurance "agreement" that would be entered into on the borrower's behalf: (i) "*will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance*"; and (ii) "*will not increase the amount Borrower will owe for Mortgage Insurance*." These representations were false and misleading because Defendants' unlawful kickback and referral fee arrangement had the direct and broad effect of "increas[ing] unnecessarily the cost of" the settlement service, PMI, on a market-wide basis. *See Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 756 n.2, 758 (3d Cir. 2009) (noting that "the provision of mortgage insurance is a 'settlement service' within the meaning of" RESPA); *see also* 12 U.S.C. § 2601(b) ("kickbacks or referral fees . . . tend to increase unnecessarily the costs of certain settlement services.").

113. Absent from the Blake and Orkis Mortgages is any mention of the identities of the Private Mortgage Insurers, the nature and/or terms of the relationship between JPMorgan and the Private Mortgage Insurers, and/or any indication as to which Private Mortgage Insurer had been

or ultimately would be selected to insure the borrower's loan.

114.    Notably, the Mortgage also fails to mention Cross Country by name, even though it was the only affiliate used by JPMorgan in the captive reinsurance agreements.   And, JPMorgan's relationship with Cross Country was not disclosed in JPMorgan's Affiliated Business Arrangement Disclosure Statement.   *See* Exhibit 40 (Blake Affiliated Business Disclosure Statement).

115.    Yet, JPMorgan continued to use its mortgage form documents throughout the Class Period, misrepresenting and/or concealing both the nature of the relationship between JPMorgan and its "affiliate" and the actual identity of the "affiliate."

116.    Defendants' consistent representations and assurances that putative reinsurance of PMI would have no impact upon borrowers' costs or rights removed any reasonable basis for Plaintiffs to further investigate the matter in connection with their respective home purchases.

117.    Putative Class members exercised due diligence by fully participating in their respective loan transactions.   Based upon Defendants' assurances (and reassurances) and affirmative acts of concealment, nothing within the information that Plaintiffs and other members of the putative Class received at their respective closing or anytime thereafter (through Defendants or otherwise) could reasonably have put them on notice of the possibility of their claims despite exercising due diligence.

118.    Plaintiffs were able to discover the underlying basis for the claims alleged herein only with the assistance of counsel.   Until that time, Plaintiffs and the other members of the putative Class had no basis upon which to believe that they should further investigate the validity of the undisclosed payments from the Private Mortgage Insurers to Cross Country for purported reinsurance.   Plaintiffs were not aware of any document or information, provided by Defendants

or otherwise, that could have put them on notice of the *possibility* of their claims. That is, there were no "storm warnings," ominous or otherwise, which could have or should have put Plaintiffs on notice of their claims.

119.    Accordingly, any delay in Plaintiffs' commencement of the litigation based upon the conduct alleged herein was excusable because they did not discover, and reasonably could not have discovered, the basis for their claims absent specialized knowledge and/or assistance of counsel.  Once Plaintiffs did discover the possibility of their claims, they acted reasonably and pursued their claims in a timely manner (within one year of the date on which each became aware of the *possibility* of their claims)[10] by filing this action.

120.    As alleged above, Plaintiff Blake's loan transaction took place on or around May 13, 2005.  Mr. Blake was only put on notice of the *possibility* of his claims when he received a notice of investigation ("Notice") from Kessler Topaz Meltzer and Check LLP ("KTMC") on or around October 11, 2011.

121.    Mr. Blake first communicated with counsel concerning the subject matter of the Notice and to discuss the basis of any *possible* claims on or around March 1, 2012.

122.    Mr. Blake signed a written agreement regarding KTMC's legal representation on or around March 21, 2012.

123.    Prior to communicating with counsel, nothing that Mr. Blake received from Defendants following his closing, by mail or otherwise, including, but not limited to:  (i) any notice or additional disclosures regarding a captive reinsurance arrangement; (ii) monthly billing statements pertaining to the payment of his respective mortgage and/or PMI; or (iii) correspondence from his lender and/or Private Mortgage Insurer, provided him with notice of

---

[10]    The applicable statutes of limitation are currently tolled under *American Pipe & Construction Co.* v. *Utah*, 414 U.S. 538 (1974) in light of the filing of *Samp v. JPMorgan Chase Bank, N.A.*, No. 11-cv-01950 (C.D. Cal.).

even the *possibility* of his claims.  For instance, nothing indicated that the purportedly legitimate captive reinsurance arrangement could have, would have, or was having, ***any practical impact*** upon his costs or loan terms, or on his mortgage insurance or settlement rights or obligations.

124.    Once Plaintiff Blake discovered the underlying basis for the claims alleged herein with the assistance of counsel, he contacted JPMorgan through their customer service line in May, 2012 to inquire about whether his loan was part of the captive reinsurance arrangement. He was told only that his Private Mortgage Insurer was Radian.

125.    As alleged above, Plaintiff Orkis' loan transaction took place on or around December 28, 2006.  Mr. Orkis was only put on notice of the *possibility* of his claims when he received a Notice from KTMC on or around September 14, 2011.

126.    Mr. Orkis first communicated with counsel concerning the subject matter of the Notice and to discuss the basis of any *possible* claims on or around November 17, 2011.

127.    Mr. Orkis signed a written agreement regarding KTMC's legal representation on or around April 13, 2012.

128.    Prior to communicating with counsel, nothing that Mr. Orkis received from Defendants following his closing, by mail or otherwise, including, but not limited to:  (i) any notice or additional disclosures regarding a captive reinsurance arrangement; (ii) monthly billing statements pertaining to the payment of his respective mortgage and/or PMI; or (iii) correspondence from his lender and/or Private Mortgage Insurer, provided him with notice of even the *possibility* of his claims.  For instance, nothing indicated that the purportedly legitimate captive reinsurance arrangement could have, would have, or was having, ***any practical impact*** upon his costs or loan terms, or on his mortgage insurance or settlement rights or obligations.

129.    Once Plaintiff Orkis discovered the underlying basis for the claims alleged herein with the assistance of counsel, he contacted JPMorgan and was told only that his Private Mortgage Insurer was MGIC.

130.    As alleged above, JPMorgan used its form mortgage documents, disclosures of affiliated business arrangements, and the entire artifice of a seemingly legitimate business arrangement, to affirmatively mislead Class members about the relationship between the reinsurer, Cross Country, and the lender, JPMorgan, and to misrepresent that any payments exchanged between the affiliated businesses, or given to them from the Private Mortgage Insurers through referral, were for actual reinsurance services rendered.

131.    The fact that JPMorgan "prepared" or presented to the putative Class the Mortgage Document does not absolve the Private Mortgage Insurers from their involvement in actively misleading Plaintiffs.

132.    Indeed, Defendants' Mortgage Document is modeled on form mortgage documents created by the Fannie Mae and/or Freddie Mac, which require Private Mortgage Insurers to obtain and maintain approval as "qualified mortgage insurers" for the purposes of providing insurance coverage that is obtained by others on loans subsequently acquired by Fannie Mae and/or Freddie Mac.  *See* Ex. 37 at 2; *see also* Ex. 38.

133.    Under the Approval Requirements, qualified mortgage insurers must, *inter alia*: (1) obtain an independent actuarial opinion for each captive reinsurance agreement, which opinions states that the provisions of the agreement satisfy the risk transfer provisions of FASB 113, and that the ceded premium is commensurate with the ceded risk; and (2) certify annually that they are in compliance with the Approval Requirements.  *See* Exhibit 37 at 10, 12.[11]

---

[11]    *See also* Fannie Mae Annual Certificate of Compliance with Terms and Conditions of Approval As a Qualified Mortgage Insurer (2003) (attached as Exhibit 41); Fannie Mae Mortgage Insurer Application (2003), at 6

134.    Without the Private Mortgage Insurers' certifications to Fannie Mae and/or Freddie Mac that their captive reinsurance arrangements with JPMorgan involved actual transfer of risk, none of the Defendants could have utilized the Mortgage Document to conceal the unlawful nature of their captive reinsurance scheme from Plaintiffs.

135.    The Private Mortgage Insurers made the aforementioned certifications to Fannie Mae and/or Freddie Mac with full knowledge that information related to those certifications would be reflected in documents presented to borrowers, demonstrating their direct involvement in effectuating the alleged "active misrepresentations."

136.    In addition, JPMorgan was also required to submit certifications to Fannie Mae and/or Freddie Mac regarding its captive reinsurance arrangements, certifying that the arrangements involved an actual transfer of risk.

137.    Upon information and belief, Defendants also actively concealed their conduct by providing incomplete and/or inaccurate information to state regulators.  As *American Banker* reported:

> All the same, banks persuaded state insurance regulators to sign off on the structures.  To judge whether the reinsurance agreements were fair, state officials relied in part on actuarial analyses submitted by the banks and insurers.
>
> Review of these opinions has found them to frequently contain significant defects and omissions which render them inapplicable to the actual reinsurance agreements executed," HUD investigators later concluded.

*See* Ex. 1.

---

(requesting description and summary of risk-sharing or risk transfer structures with mortgage entities or their affiliates), 10 (requesting attachment of "[a]ny actuarial opinions obtained to support reinsurance agreements with captive reinsurance companies or other risk sharing or risk transfer structures with mortgage entities or affiliates of mortgage entities") (attached as Exhibit 42).

138.    Even when some industry analyst and ratings agencies questioned the captive reinsurance deals, banks *and* insurers publicly maintained that they met the standards set forth in the HUD letter.  *Id*.

139.    Putative Class members thus did not, and could not, possess sufficient information to even put them on notice of the true nature of JPMorgan's captive reinsurance arrangements.  The average homebuyer is neither an insurance expert nor a reinsurance expert. Clearly, a mortgage provision stating that JPMorgan **may** enter into captive reinsurance relationships, coupled with assurances that any such arrangement will have no practical effect on a borrower's rights or interests, is insufficient to put the average homebuyer on notice that anything improper or actionable may have occurred with respect to that reinsurance or that her rights under RESPA may be violated.

140.    Similarly, a notice that states that JPMorgan may receive a financial benefit also does not put the average homebuyer on notice of any improper or illegal conduct.  *See, e.g.*, Reinsurance Kickbacks (noting that even HUD's investigation "may have stagnated because demonstrating that the captive reinsurance amounted to kickbacks would require accounting expertise that the Department does not possess").  This is especially true where affirmative misrepresentations as to transfer of risk are included in the lender's statements/disclosures concerning captive reinsurance.

141.    Notably, even if Plaintiffs did know that their loans were included in a reinsurance arrangement, despite the fact the name of the "affiliate" was not disclosed in the Mortgage Document, Cross Country and other captive reinsurance companies incorporated in "captive-friendly" states are not required to file with the NAIC the type of detailed annual reports usually required of commercial insurance companies.  *See* Exhibit 43 hereto (Janis Mara,

*Wells Fargo, Citibank Under Investigation in Alleged Kickback Schemes*, Inman News (Mar. 7, 2005) ("The annual reports and actuarial reports of Vermont captives are protected by the state's confidentiality laws and cannot be accessed without a court order by anyone other than a regulator.")).

142.    Cross Country does not have a website.  As a result, information regarding Cross Country and its practices is not publicly available for Plaintiffs or others to discover.  Even the most sophisticated borrower could not, for example, simply contact the NAIC to obtain information on JPMorgan's captive reinsurer.

143.    Further, as alleged herein, the terms of the captive reinsurance arrangement and the purported transfer of risk therein were misrepresented.  The disclosure stating that an affiliated reinsurer "may" assume some portion of the risk associated with mortgage insurance cannot, by itself, raise any notice of a possible claim absent an understanding of what that assumption actually required—*i.e.*, the legitimate transfer of risk—and an understanding of the contractual terms involved in Defendants' captive reinsurance arrangement.  No reference to RESPA or any other applicable statute or standard governing what renders a captive reinsurance arrangement legitimate was included in Defendant JPMorgan's Mortgage form.  Meanwhile, any investigation into the public record concerning Cross Country would have revealed that Defendants had publicly and explicitly affirmed to the OCC that JPMorgan's captive reinsurer would conduct its activities in compliance with RESPA.  *See* Exhibit 44 (OCC Decision at n.22). Defendants never corrected or otherwise amended this representation.

144.    For instance, HUD investigators have alleged that "Vermont insurance regulators went a step further in enabling the mortgage reinsurance business to flourish," finding that:

> Vermont regulators signed off on actuarial opinions from banks and insurers that failed to accurately describe the terms of the reinsurance deals in question,

overpaid banks for the risk they were taking and allowed banks to claim insurance trust accounts were capitalized with money that had been explicitly deemed off-limits for claims-paying purposes.

Ex. 2 (Mortgage Kickback Scheme) (also noting that, when "[f]aced with the prospect of either tacitly admitting that it was not taking on actual risk or filing financial statements that did not conform to accounting guidelines, [Countrywide Financial Corporation's captive reinsurer] Balboa was rescued by Vermont insurance officials.").

145.    Nothing provided to Plaintiffs could sufficiently put them on notice that anything improper or actionable may have occurred with respect to any underlying reinsurance agreements or that their rights under RESPA may have been violated.  *See, e.g.*, Ex. 1 (Reinsurance Kickbacks) (noting that even HUD's investigation "may have stagnated because demonstrating that the captive reinsurance amounted to kickbacks would require accounting expertise that the Department does not possess").   Upon information and belief, given Defendants' use of carefully crafted form documents, the same is true for other putative Class members.

## CLASS ALLEGATIONS

146.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1) and/or (b)(3) on behalf of themselves and a class of all other similarly situated persons who obtained residential mortgage loans originated, funded and/or originated through correspondent lending by JPMorgan or any of its subsidiaries and/or affiliates between January 1, 2004 and the present and, in connection therewith, purchased, either directly or indirectly, private mortgage insurance and whose residential mortgage loans were included within JPMorgan's captive mortgage reinsurance arrangements (the "Class").

147.    The Class excludes Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns.

148.    The members of the Class are so numerous that joinder of all members is impracticable.

149.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

150.    Plaintiffs' claims are typical of the claims of the Class.

151.    There are questions of law and fact common to the Class, the answers to which will advance the resolution of the claims of all the Class members, including but not limited to:

    a)    Whether Defendants' captive reinsurance arrangements involved sufficient transfer of risk;

    b)    Whether payments to Cross Country were *bona fide* compensation and solely for services actually performed;

    c)    Whether payments to Cross Country exceeded the value of any services actually performed;

    d)    Whether Defendants' captive reinsurance arrangements constituted unlawful kickbacks from the Private Mortgage Insurers;

    e)    Whether JPMorgan accepted referral fees from the Private Mortgage Insurers or a portion, split or percentage of borrowers' private mortgage insurance premiums from the Private Mortgage Insurers other than for services actually performed;

    f)    Whether the Private Mortgage Insurers paid or gave referral fees to JPMorgan or a portion, split or percentage of borrowers' private mortgage insurance premiums to JPMorgan other than for services actually performed;

g) Whether the Private Mortgage Insurers entered an agreement/understanding to funnel kickbacks to JPMorgan in exchange for the referral of business; and

h) Whether Defendants are liable to Plaintiffs and the Class for statutory damages pursuant to RESPA Section 2607(d)(2).

152. These questions of law and/or fact are common to the Class and predominate over any questions that may affect only individual members of the Class. The basic terms and contours of Defendants' challenged captive reinsurance arrangements are not tied to any specific, individual consumer loan. Rather, the captive reinsurance arrangements apply to groups or pools of loans. Further, each Class member that Plaintiffs seek to represent was required, as part and parcel of obtaining his or her JPMorgan mortgage loans, to pay for private mortgage insurance from one of the Private Mortgage Insurers—each of which had a reinsurance contract with Cross Country, structured as challenged here—to purchase "reinsurance" on that private mortgage insurance. The essential and basic terms of each of those "reinsurance" contracts between Cross Country and the Private Mortgage Insurers were substantially similar, and each Class member, no matter the Private Mortgage Insurer to which they were referred, suffered the same harm entitling them to demand the same statutory damages. Accordingly, this is the quintessential consumer class action lawsuit.

153. The same common issues predominate with respect to all members of the Class, regardless of whether their loans were originated or funded by JPMorgan or originated through correspondent lending. Regardless of whether JPMorgan or a third-party lender made the initial referral to the Private Mortgage Insurer, Defendants' conduct violates Sections 8(a) and (b) of RESPA, as alleged herein.

154. Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiffs have no claims antagonistic to those of the Class. Plaintiffs have retained counsel competent and experienced in complex nationwide class actions, including all aspects of litigation. Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the Class.

155. Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

156. Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

157. Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF RESPA, 12 U.S.C. § 2607
### (By Plaintiffs Individually and on Behalf of the Class)

158. Plaintiffs hereby incorporate by reference ¶¶ 1-158 as if they were fully set forth herein.

159.   Throughout the Class Period, Defendants provided "settlement services" and/or engaged in business incident to real estate settlement services in respect of "federally-related mortgage loans," as such terms are defined by RESPA Sections 2602(1) and (3).

160.   Plaintiffs and other members of the Class obtained federally-related residential mortgage loans through JPMorgan and collectively have made hundreds of millions of dollars in private mortgage insurance premium payments in connection with their real estate closings.

161.   The amounts paid by the Private Mortgage Insurers and accepted by JPMorgan through its captive reinsurance arrangements constitute "things of value" within the meaning of RESPA Section 2602(2).

162.   Defendants arranged for an unlawfully excessive split of borrowers' premiums to be ceded to Cross Country under carefully crafted excess-of-loss and purported quota share reinsurance contracts.

163.   These ceded premiums:  (i) were not for services actually furnished or performed; and/or (ii) exceeded the value of any such services provided.

164.   The hundreds of millions of dollars paid by the Private Mortgage Insurers and accepted by JPMorgan through its captive reinsurance arrangements constituted fees, kickbacks or things of value pursuant to agreements between JPMorgan and the Private Mortgage Insurers. Such practices violated RESPA, 12 U.S.C. § 2607(a).

165.   In connection with transactions involving federally-related mortgage loans, the Private Mortgage Insurers gave, and JPMorgan accepted, a portion, split or percentage of charges received by the Private Mortgage Insurers for the rendering of real estate settlement services and/or business incident to real estate settlement services other than for services actually performed, in violation of RESPA, 12 U.S.C. § 2607(b).   The money paid by the Private

51

Mortgage Insurers and accepted by JPMorgan through its captive reinsurer was a portion, split or percentage of the private mortgage insurance premiums paid by JPMorgan's customers. Cross Country participated in the scheme and served as the direct party to which the split was paid. Cross Country agreed to provide purported "reinsurance" services involving private mortgage insurance paid by Plaintiffs and other members of the Class.

166.    Plaintiffs and other members of the Class were subjected to settlement services and/or business incident to real estate settlement services tainted by kickbacks or referrals of business inherently biased by Defendants' unlawful kickback scheme. Defendants' reinsurance arrangements with the Private Mortgage Insurers over time affected the price, quality or other characteristics of the "referred" private mortgage insurance through, among other things, inherent limits on settlement service choice and competition.

167.    Plaintiffs and other Class members were harmed in that, as a matter of law, they were entitled to purchase settlement services from providers that did not participate in unlawful kickback and/or fee-splitting schemes. Congress bestowed upon Plaintiffs and other Class members a right to a real estate settlement free from unlawful kickbacks and unearned fees, and has expressly provided for private enforcement of this protected right by empowering consumers to recover statutory damages from offending parties without proof of an overcharge. *See* 12 U.S.C. §§ 2601, 2607(d)(2). The Private Mortgage Insurers have given, and JPMorgan has accepted, unlawful kickback payments and/or an unearned portion of settlement service charges and/or charges for business incident to real estate settlement services—private mortgage insurance premiums—in violation of RESPA.

168.    Defendants' scheme also resulted in a limitation on both settlement service choice and competition. JPMorgan eliminated competition among providers of private mortgage

insurance by requiring its borrowers to purchase private mortgage insurance from one of the Private Mortgage Insurers with whom it had an arrangement.  Upon information and belief, Plaintiffs allege that referred borrowers were allocated to one of the Private Mortgage Insurers on a rotating or other systematic basis, which unlawfully guaranteed business for each Private Mortgage Insurer in return for a referral fee.  Defendants' referral of insurance business to a particular Private Mortgage Insurer was not based upon an evaluation of price, quality, service provided, reputation, performance or any other aspect of the coverage that the selected Private Mortgage Insurer provided.

169.    Further, as set forth above, Defendants did not disclose the true nature of the reinsurance arrangements to Plaintiffs.  Congress has already determined that an unlawful kickback/referral arrangement, such as the sham captive mortgage reinsurance arrangement at issue here, may reduce competition among settlement service providers.  *See Carter v. Welles-Bowen Realty, Inc.*, 553 F.3d 979, 987 (6th Cir. 2009) (explaining that the 1983 amendment to the RESPA statute was necessary to address "practices [that] could result in harm to consumers beyond an increase in the cost of settlement services," including the reduction of healthy competition) (citing H.R. Rep. No. 97-532, at 52 (1982)).

170.    Moreover, though not necessary to prevail on their claims, Plaintiffs and other Class members were harmed in that their private mortgage insurance premiums were artificially inflated as a result of Defendants' conduct.  Congress has already determined that the ***aggregate*** effect of an unlawful kickback/referral arrangement, such as a sham captive mortgage reinsurance arrangement, is to unnecessarily inflate the costs consumers pay for real estate settlement services.  *See* 12 U.S.C. § 2601(b) ("It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result . . . (2) in the

elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services."). Thus, kickbacks and unearned fees unnecessarily and artificially inflate the price of settlement service charges, including private mortgage insurance premiums. In any event, although Plaintiffs allege that they were overcharged for mortgage insurance, "[t]he plain language of RESPA section 8 does not require Plaintiff to allege an overcharge." *See Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 759 (3d Cir. 2009).

171.     Under Defendants' scheme, the mortgage insurance premiums paid by Plaintiffs and the Class necessarily and wrongly included payments for both: (i) actual mortgage insurance services; and (ii) payments unlawfully kicked back to JPMorgan's captive reinsurer that far exceeded the value of any services performed (indeed, there were no services performed in return for this payment) and, were also, in fact, illegal referral fees.

172.     For the reasons set forth above, Defendants have violated RESPA, 12 U.S.C. §§ 2607(a) and (b). Pursuant to RESPA, 12 U.S.C. § 2607(d), Defendants are jointly and severally liable to Plaintiffs and the Class in an amount equal to three times the amounts they have paid or will have paid for private mortgage insurance as of the date of judgment.

173.     In accordance with RESPA, 12 U.S.C. § 2607(d), Plaintiffs also seek attorneys' fees and costs of suit.

### COUNT II
### COMMON-LAW RESTITUTION/UNJUST ENRICHMENT
### (By Plaintiffs Individually and on Behalf of the Class)

174.     Plaintiffs hereby incorporate by reference ¶¶ 1-174 as if they were fully set forth herein.

175.     Plaintiffs have conferred a substantial benefit upon Defendants which has been appreciated by Defendants. Pursuant to an agreement and/or understanding in effect during the Class Period between Defendants and the Private Mortgage Insurers to which neither Plaintiffs

nor other members of the Class were parties, the Private Mortgage Insurers collected and wrongfully paid as a referral fee to JPMorgan hundreds of millions of dollars as JPMorgan's unlawful split or share of the private mortgage insurance premiums paid by Plaintiffs and other putative Class members.

176.    The amounts of the private mortgage insurance premiums paid by Plaintiffs and other Class members and collected and ceded to Cross Country as purported reinsurance premiums were accepted and retained by JPMorgan under circumstances such that it would be inequitable for JPMorgan to retain the benefit of such payments given that the real insurance and/or transfer of risk contemplated by the agreement was not being provided.

177.    As a result of Defendants' unjust enrichment, Plaintiffs and the Class have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

178.    Further, Plaintiffs and the Class seek restitution and disgorgement of profits realized by Defendants as a result of their unfair, unlawful and/or deceptive practices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and the Class and award the following relief:

A.    Certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as representatives of the Class and Plaintiffs' counsel as counsel for the Class;

B.    Declaring, adjudging, and decreeing the conduct alleged herein as unlawful;

C.    Awarding Plaintiffs and the Class statutory damages pursuant to RESPA

Section 8(d)(2), 12 U.S.C. § 2607(d)(2);

D.      Granting Plaintiffs and the Class costs of suit, including reasonable attorneys' fees and expenses;

E.      Granting Plaintiffs and the Class restitution of all improperly collected reinsurance premiums and/or disgorgement of Defendants' ill-gotten gains, and imposing an equitable constructive trust over all such amounts for the benefit of the Class and Subclass; and

F.      Granting Plaintiffs and the Class such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all claims in this action so triable.

Dated:  November 4, 2013                                 Respectfully submitted,

**KESSLER, TOPAZ
MELTZER & CHECK, LLP**

JHM8493_____
Joseph H. Meltzer, Esq.
Edward W. Ciolko, Esq.
Terence S. Ziegler, Esq.
Matthew T. Stone, Esq.
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**BERKE, BERKE & BERKE**
Ronald J. Berke, Esq.
420 Frazier Avenue
Chattanooga, TN  37402
Telephone: (423) 266-5171
Facsimile: (423) 265-5307

**BRAMSON, PLUTZIK, MAHLER &
BIRKHAEUSER LLP**
Alan R. Plutzik, Esq.
2125 Oak Grove Blvd., Suite 120
Walnut Creek, CA 94598
Telephone: (925) 945-0770
Facsimile: (925) 945-8792

*Attorneys for Plaintiffs and the Proposed
Class*