## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | **:** | |
| **CHRISTOPHER BLAKE and JAMES** | **:** | **CIVIL ACTION** |
| **ORKIS, individually and on behalf of all** | **:** | |
| **others similarly situated,** | **:** | |
| Plaintiffs, | **:** | **No. 13-6433** |
| | **:** | |
| v. | **:** | |
| | **:** | |
| **JPMORGAN CHASE BANK, N.A.,** | **:** | |
| **CHASE BANK USA, N.A.,** | **:** | |
| **JPMORGAN CHASE & CO., and** | **:** | |
| **CROSS COUNTRY INSURANCE** | **:** | |
| **COMPANY,** | **:** | |
| Defendants. | **:** | |

# M E M O R A N D U M

STENGEL, J.                                                                      April 26, 2017

## I.      INTRODUCTION

This is a putative class action brought by homeowners claiming violations of the

Real Estate Settlement Procedures Act, 12 U.S.C. § 2607 (RESPA). The plaintiffs claim

that the defendants carried on a "captive reinsurance scheme," through which they

enjoyed kickbacks, referrals, and fees that are prohibited by RESPA.

This case was stayed pending the U.S. Court of Appeals for the Third Circuit's

decision in Cunningham v. M & T Bank Corp., 814 F.3d 156 (3d Cir. 2016). Both parties

sought a stay pending the Cunningham decision because the issue in that case was

identical to an issue in this case: whether equitable tolling applies to RESPA's one-year

statute of limitations. Now that Cunningham has been decided, the plaintiffs move for

leave to amend their complaint to modify their RESPA claim and to add new claims

under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* (RICO). For the reasons that follow, I will grant in part and deny in part the plaintiffs' motion for leave to amend.

## II. BACKGROUND

For purposes of this motion, I will briefly discuss both the substantive nature of the plaintiffs' claims as well as the procedural posture of this case.

### A. *The Nature of Plaintiffs' RESPA Claims*

Many people who purchase a home cannot afford to make a 20% down payment. To protect lenders in the event of default, homeowners who are unable to make a 20% down payment are required to purchase private mortgage insurance. Once a homeowner enters into a mortgage insurance contract with an insurance company (an "insurer"), often times, the insurer then enters into a separate "reinsurance" arrangement with another company (a "reinsurer"). In theory, and under RESPA, the reinsurer is required to assume part of the risk that the insurer took on when it entered into a contract with the homeowner.

In this case, the plaintiffs allege that the defendant insurers, lenders, and reinsurers have colluded to create a scheme that violates RESPA. The plaintiffs maintain that the lenders, as a general practice, form subsidiary companies that become the reinsurers. These lenders then systematically refer homeowners to the insurers to buy mortgage insurance. In exchange for a constant stream of profit-producing homeowner-borrowers, the insurers then pay a kickback to the reinsurer who, as a subsidiary, is really just an extension of the lender. The plaintiffs claim that this "pay-to-play" scheme harms

homeowners because, by colluding, the insurers, reinsurers, and lenders, were able to reduce competition in the mortgage insurance market, thereby increasing the premium payments the homeowner-plaintiffs are required to pay to maintain their mortgage insurance.

There is nothing inherently wrong with—or unlawful about—reinsurance contracts. Nonetheless, RESPA prohibits certain captive reinsurance schemes that result in "sham" service. See Alston v. Countrywide Fin. Corp., 585 F.3d 753, 755–57 (3d. Cir 2009) (explaining how certain captive reinsurance schemes, like the one alleged here, may violate RESPA). Specifically, Section 8(a) of RESPA prohibits fees and kickbacks paid in exchange for business referrals involving federally related mortgage loans. 12 U.S.C. § 2607(a). Section 8(b) prohibits unearned fees: "No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service . . . other than for services actually performed." Id. § 2607(b). In this case, the plaintiffs allege that the defendants violated these provisions of RESPA because: (1) they systematically gave and received kickbacks; (2) the reinsurers did not assume any real risk; and (3) the reinsurers never "actually performed" any true reinsurance services.

### B. Procedural Background

The plaintiffs filed their initial complaint on November 4, 2013, asserting claims for RESPA violations and common law unjust enrichment. (Docket No. 1). Shortly thereafter, the defendants moved to dismiss the plaintiffs' RESPA claims as untimely.

Prior to receiving a disposition on the motion to dismiss, on May 22, 2014 the parties filed a joint motion to stay all proceedings pending the Third Circuit's decision in Riddle v. Bank of America Corp., 588 F. App'x 127 (3d Cir. 2014). (Docket No. 25.) Riddle addressed the issue of equitable tolling with respect to RESPA's statute of limitations. After the Third Circuit decided Riddle, the stay was lifted on October 28, 2014. (Docket No. 27). I then ordered the parties to file supplemental briefs on the motion to dismiss. Again before the motion to dismiss was decided, however, on February 19, 2015, the parties filed another joint motion to stay all proceedings pending the Third Circuit's decision in Cunningham. (Docket No. 30). In the joint motion to stay, the parties agreed that "the ultimate resolution of the central issue in the Cunningham Action, i.e. the applicability and application of the doctrine of equitable tolling, has a very reasonable likelihood of informing this Court on the resolution of such matters in this case, and advancing the ultimate disposition of this action." (Id. at 2). Months later, during this Cunningham stay, the Consumer Financial Protection Bureau ("CFPB") issued a decision in a landmark RESPA case, holding that RESPA's statute of limitations did not bar claims for kickbacks that occurred after the closing of home loans.

Several months after this CFPB decision, the Third Circuit decided Cunningham. The plaintiffs in Cunningham were homeowners who brought the same type of RESPA claim—based on reinsurance kickbacks—that the plaintiffs brought in this case. 814 F.3d at 158. Those plaintiffs did not file their complaint until years after RESPA's one-year statute of limitations had expired. Id. They relied on equitable tolling to argue that their claims were timely. Id. In fact, they made the same exact argument that has previously

4

been made in this litigation: the first time they became aware of their RESPA claims was when they received letters informing them of the potential viability of the claims. Id. at 162. The Third Circuit expressly rejected this equitable tolling argument. Id. at 160–62. It found that the plaintiffs became aware of their RESPA claims much earlier: on the date of closing when they read certain disclosures that explained reinsurance. Id. at 161–64. The court held that the Cunningham plaintiffs were not reasonably diligent in bringing their claims, which is required of them to enjoy the doctrine of equitable tolling based on fraudulent concealment. Id. at 163–64.

In this case, the defendants moved to lift the stay on July 15, 2016, which the plaintiffs did not oppose, and I ordered the stay lifted on February 17, 2017. The plaintiffs now move for leave to amend their complaint to modify their RESPA claim and to add new claims under RICO.

## III.    LEGAL STANDARD

Federal Rule of Civil Procedure 15 governs amendment of pleadings generally. Fed. R. Civ. P. 15. The U.S. Court of Appeals for the Third Circuit has explained that a district court's inquiry is distinctly different under Rule 15(a) than it is under Rule 15(c). Arthur v. Maersk, Inc., 434 F.3d 196, 202–03 (3d Cir. 2006).

Rule 15(a) applies to motions for leave to amend. "The Federal Rules of Civil Procedure express a preference for liberally granting leave to amend." Oran v. Stafford, 226 F.3d 275, 291 (3d Cir. 2000). A motion for leave to amend a complaint should be granted "whenever justice so requires." Fed. R. Civ. P. 15(a); Arthur, 434 F.3d at 203. In determining whether "justice so requires," courts consider a number of factors including

undue delay, bad faith, prejudice to the opposing party, and futility. Foman v. Davis, 371 U.S. 178, 182 (1962). Delay alone is not sufficient to warrant denial of leave to amend. Adams v. Gould Inc., 739 F.2d 858, 868 (3d Cir. 1984). However, when delay becomes "undue," it forms an adequate basis, on its own, for denial of a motion to amend. Bjorgung v. Whitetail Resort, LP, 550 F.3d 263, 266 (3d Cir. 2008). "Delay becomes 'undue,' and thereby creates grounds for the district court to refuse leave, when it places an unwarranted burden on the court or when the plaintiff has had previous opportunities to amend." Id. Thus, an undue delay analysis requires courts to focus on "the movant's reasons for not amending sooner." Id. (quoting Cureton v. Nat'l Collegiate Athl. Ass'n, 252 F.3d 267, 273 (3d Cir. 2001)). A proposed amendment is futile "if the amendment will not cure the deficiency in the original complaint or if the amended complaint cannot withstand a renewed motion to dismiss." Jablonski v. Pan Am. World Airways, Inc., 863 F.2d 289, 292 (3d Cir. 1988) (citation omitted).

Rule 15(c) addresses the issue of whether a proposed amended complaint "relates back" to the filing of the original complaint. Under Rule 15(c)(1)(B), an amendment to a pleading relates back to the date of the original pleading where "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." "Where an amendment relates back, Rule 15(c) allows a plaintiff to sidestep an otherwise-applicable statute of limitations, thereby permitting resolution of a claim on the merits, as opposed to a technicality." Glover v. FDIC, 698 F.3d 139, 145 (3d Cir. 2012) (citation omitted). The Third Circuit has made clear that "only where the opposing party is given fair notice of the general fact

situation and the legal theory upon which the amending party proceeds will relation back be allowed." <u>Id.</u> at 146 (internal quotation marks and citation omitted). On the contrary, "amendments that significantly alter the nature of a proceeding by injecting new and unanticipated claims are treated far more cautiously." <u>Id.</u> (internal quotation marks and citation omitted). When a plaintiff's original complaint does not provide a defendant "'fair notice of what the plaintiff's [amended] claim is and the grounds upon which it rests,' the purpose of the statute of limitations has not been satisfied and it is 'not an original pleading that [can] be rehabilitated by invoking Rule 15(c).'" <u>Id.</u> (quoting <u>Baldwin Cty. Welcome Ctr. v. Brown</u>, 466 U.S. 147, 149 n.3 (1984)).

## IV.    DISCUSSION

Plaintiffs move for leave to amend their complaint to modify their RESPA claim "such that it is limited to violations within the one year statutory period," and to add RICO claims. (Pls.' Mem. Supp. Mot. Leave to Amend 3.) Defendants oppose plaintiffs' motion, and argue that the motion is unduly delayed, that they would be prejudiced by amendment, and that the proposed amendment is futile.

Because I find the continuing violations doctrine applicable to the plaintiffs' RESPA claims, I will grant them leave to amend their RESPA claims.[1] I will deny the plaintiffs' motion to amend the complaint to add RICO claims because (1) the plaintiffs'

---

[1] Although I am granting the plaintiff's motion to amend the RESPA claims, amendment is not strictly necessary since the plaintiffs are merely asserting a new legal argument—not new facts or a new legal claim. Thus, what I am really deciding today is that the continuing violations doctrine applies to plaintiffs' RESPA claims as they have been pled all along.

actions—and lack thereof—constitute undue delay with respect to these claims; and (2) the RICO claims do not relate back to the original complaint under Rule 15(c).

### A.    *Plaintiffs' Proposed Modified RESPA Claim*

The plaintiffs assert that their proposed RESPA claim is substantively identical to the RESPA claim alleged in the original complaint, and that the only difference is that they no longer rely on equitable tolling. Instead, they argue that their RESPA claims were triggered each time a kickback payment was made.

### 1.    RESPA's Statute of Limitations

An action under Section 2607 of RESPA must be brought within "1 year . . . from the date of the occurrence of the violation." 12 U.S.C. § 2614. In Cunningham, the Third Circuit noted that this statute of limitations begins running "from the date of the occurrence of the violation . . . which begins at the closing of the loan." 814 F.3d at 160 (citation omitted); In re Cmty. Bank of N. Va., 622 F.3d 275, 281 (3d Cir. 2010) ("RESPA's one-year statute of limitations . . . begins to run from the date of the occurrence of the violation, . . . *i.e.*, the date the loan closed") (citation omitted). The plaintiffs assert, however, that closing is not the only time that a RESPA violation could occur. Rather, they argue that the defendants violated RESPA each time they paid an illegal kickback or fee, or made an illegal referral, in connection with PMI premiums. According to the plaintiffs, each violation triggered a new statute of limitations period.

### 2.    The Continuing Violations Doctrine

"In most federal causes of action, when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing

practice falls within the limitations period." <u>Brenner v. Local 514 United Bros. of Carpenters of Am</u>, 927 F.2d 1283, 1295 (3d Cir. 1991); <u>287 Corp. Ctr. Assocs. V. Township of Bridgewater</u>, 101 F.3d 320, 324 (3d Cir. 1996) (noting the same). As the U.S. Court of Appeals for the Third Circuit has explained, "[t]he continuing violations doctrine has been most frequently applied in employment discrimination claims." <u>Cowell v. Palmer Twp.</u>, 263 F.3d 286, 292 (3d Cir. 2011). "However, this has not precluded the application of the doctrine to other contexts." <u>Id.</u>

The U.S. Supreme Court and Third Circuit have applied the continuing violations doctrine in a wide variety of contexts. <u>See</u>, <u>e.g.</u>, <u>Zenith Radio Corp. v. Hazeltine Research, Inc.</u>, 401 U.S. 321, 338 (1971) (applying the doctrine to an antitrust claim under the Sherman Act); <u>Hanover Shoe, Inc. v. United Shoe Mach. Corp.</u>, 392 U.S. 481, 502 n.15 (1968) (same); <u>Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.</u>, 530 F.3d 204, 217–18 (3d Cir. 2008) (recognizing the continuing violations doctrine's applicability in antitrust cases); <u>Brenner</u>, 927 F.2d at 1283 (applying the doctrine to a claim brought under the National Labor Relations Act); <u>Centifanti v. Nix</u>, 865 F.2d 1422, 1432–33 (3d Cir. 1999) (applying the doctrine to a constitutional due process claim brought under 42 U.S.C. § 1983); <u>Cowell</u>, 263 F.3d at 292–93 (finding the doctrine generally applicable to § 1983 cases but not in the particular case at bar); <u>Crawford v. Washington Cty. Children & Youth Servs.</u>, 353 F. App'x 726, 729 (3d Cir. 2009) (same); <u>In re Niaspan Antitrust Litig.</u>, 42 F. Supp. 3d 735, 745–47 (E.D. Pa. 2014) (finding the doctrine applicable to Sherman Act pay-for-delay and price-fixing claims based on a "continuing illegal contract" under which the defendants continued to sell drugs "at an above-market price").

The Third Circuit has also emphasized that "application of the continuing violations doctrine is not dependent on which statute gives rise to the plaintiff's claim." <u>Cardenas v. Massey</u>, 269 F.3d 251, 258 (3d Cir. 2001).

### 3.      <u>RESPA and the Continuing Violations Doctrine</u>

Against this backdrop, the defendants argue that amendment would be futile because the continuing violations doctrine does not apply to the plaintiffs' RESPA claims, and that the plaintiffs' position is contrary to well-settled law. (<u>See</u> Defs.' Resp. Opp'n 4.) In support, they note that the Third Circuit has held that RESPA's statute of limitations begins to run on the date that plaintiffs closed on their loans. <u>Cunningham</u>, 814 F.3d at 160. For a number of reasons discussed in more detail below, the defendants' argument is premised on an overly narrow view of the universe of potential RESPA violations. First, RESPA's limitations period only runs from the date of the closing if I assume the continuing violations doctrine does not apply to the plaintiffs' claims. Second, RESPA's statutory text clearly prohibits certain post-closing kickbacks, fees, and referrals, and the plaintiffs have offered persuasive authority confirming the same. Third, applications of the continuing violations doctrine in other analogous contexts support application of the doctrine to plaintiffs' RESPA claims. Fourth, the idea that there can be only one violation of RESPA (at the closing) contradicts U.S. Supreme Court precedent. Finally, application of the continuing violations doctrine in the RESPA context does not conflict with <u>Cunningham</u>.

### a. The Continuing Violation Doctrine's Potential Effect on When RESPA's Statute of Limitations Expires

To begin with, I agree that ordinarily RESPA's statute of limitations begins running on the date that a homeowner closes on his or her home loan. Id. However, the question of when a statute of limitations begins to run (by default) is entirely separate from the question of whether or not subsequent kickbacks, fees, and referrals are violations of RESPA that can trigger new limitations periods. This is because, "under the continuing violation theory, the statute of limitations runs from the date of the last alleged violation rather than the first." Burnette v. City of Phila., No. Civ. A. 02–cv–21293682, 2003 WL 21293682, at *2 (E.D. Pa. Jan. 14, 2003) (citing Cowell, 293 F.3d at 292) (additional citations omitted). Under this doctrine, RESPA's statute of limitations will only begin to run upon the most recent alleged RESPA violation committed by defendants. In other words, even though RESPA's statute of limitations begins to run at the moment the plaintiffs close on their loan, this does not affect the possibility that a subsequent pattern of kickbacks and fees (prohibited by RESPA) amounts to a "continuing violation," thereby re-setting the statute of limitations upon each new violation.

### b. The CFPB Decision On RESPA's Statute of Limitations

The plaintiffs rely on persuasive authority suggesting that the continuing violations doctrine applies to their RESPA claims. In 2015, the CFPB brought an enforcement action against a national mortgage lender for violations of RESPA based on a captive reinsurance scheme. In the Matter of PHH Corp., No. 2014-CFPB-0002 (CFPB,

June 4, 2015) [Doc. No. 224-7]. This enforcement action resulted in a $109 million fine to the lender. Id. at 26–27. In arriving at its decision, the CFPB concluded that the defendant "violated RESPA every time it accepted a reinsurance payment." Id. at 22. It rejected the argument that there can be only one violation of RESPA. Id. at 23 ("[T]he use of the singular 'violation' in the statute of limitations indicates only that there is one limitations period for one violation, not that a transaction involving multiple kickback payments would result in only a single violation"). It pointed out that "a single course of conduct can result in multiple violations of a statute, regardless of whether the relevant statute of limitations refers to a single cause of action." Id. (citing Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp., 522 U.S. 192, 201–02 (1997)).[2] Consequently, the CFPB held the defendant "liable for each payment it accepted on or after [a certain date] even if the loan with which that payment was associated had closed prior to that date." Id. at 22.

The CFPB went out of its way to distinguish between situations where borrowers pay insurance policies at one time "in full" as compared to captive reinsurance schemes where borrowers pay for insurance as a part of each and every mortgage payment. Id. at 22. In the former situation, it makes sense to apply RESPA's statute of limitations to that one event: the payment of the policy in full. In the latter situation, however, it defies the plain language of § 2607 to not consider each prohibited kickback or referral a separate

_____

[2] In Bay Area Laundry, the U.S. Supreme Court held that in an ERISA case, "each missed payment creates a separate cause of action with its own . . . limitations period." 522 U.S. at 195. The Court rejected the argument that the plaintiffs' failure to sue within the limitations period following the "first" missed payment time-barred the plaintiffs' claims for all subsequent missed payments. Id. at 195–96.

violation capable of resetting the limitations period. Since certain kickbacks, fees, and referrals are unlawful under RESPA, the very nature of a reinsurance arrangement would mean that the defendants "committed multiple violations over time in connection with a single loan." In the Matter of PHH Corp., at 25.

I agree with the CFPB's distinction here. Some of RESPA's statutory provisions certainly relate to the closing of a home loan. This is because borrowers usually purchase settlement services at closing. Id. Simply because the closing may be the first time that a RESPA violation occurs, however, does not mean that other RESPA violations may not subsequently occur. Section 8 clearly speaks in terms of each fee, kickback, or referral as being its own violation of RESPA. 12 U.S.C. § 2607 (prohibiting the act of either "accept[ing]" or "giv[ing]" a "fee, kickback, or thing of value"). If this were not the case, then lenders, insurers, and reinsurers would be free to violate RESPA by accepting kickback after kickback for years on end. When a borrower would sue under RESPA for this conduct, the lenders, insurers, and reinsurers could avoid liability if the borrower did not file suit within one year of the very first (of many) illegal acts.[3] Such a reading of the statute would eviscerate the clear purpose behind RESPA, which aims to eliminate

---

[3] To offer an illustration, a lender could accept dozens of illegal kickbacks, starting on January 1, 2017 (the date of the closing) and continuing through January 1, 2019. Under the defendants' reading of RESPA, any borrower who sued on January 3, 2018—for example— would be too late. This would be the case even if the most recent illegal kickback had occurred a day before the borrower filed his or her complaint. It goes against basic principles of fairness and logic to expect consumers to somehow understand the ongoing nature of a captive reinsurance scheme on the day of their closing, before this scheme even takes effect. This is especially true because—unlike at closing where consumers are present with the bank on the other side of the table—the plaintiffs here had no way of knowing when the defendants were paying kickbacks as they are not privy to the inner workings of the defendants' daily financial transactions.

"kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." 12 U.S.C. § 2601(b)(2). Accordingly, I find that RESPA would be violated each and every time an unlawful fee or kickback was delivered or accepted. Each alleged violation, in turn, reset RESPA's one-year statute of limitations. Therefore, the plaintiffs' claims would be untimely only if there had been no alleged kickback, fee, or referral within the one year leading up to the day they filed their complaint.[4]

### c.        The D.C. Circuit's Remand of the CFPB Decision

The defendants criticize the plaintiffs' reliance on the CFPB's decision because the U.S. Court of Appeals for the D.C. Circuit vacated in part and remanded that decision. PHH Corp. v. CFPB, 839 F.3d 1 (D.C. Cir. 2016). The D.C. Circuit did vacate part of the CFPB's decision, but it did so purely on unrelated constitutional grounds. Specifically, it held that the CFPB's structure violated Article II of the U.S. Constitution

---

[4] RESPA explicitly prohibits certain kickbacks, fees, and referrals. 12 U.S.C. § 2607. Because these acts are specifically prohibited by statute, they are not the "continual ill effects" of a prior violation but rather violations in their own right. Cf. MacNamara v. Hess, 67 F. App'x 139, 143 (3d Cir. 2003) (explaining that the continuing violations doctrine does not apply to situations where there are mere "ill effects stemming from an original violation"). In MacNamara, the Third Circuit held, in the context of § 1983, that the government's failure to return plaintiff's seized records was not a continuing violation but rather a mere "ill effect" of the original unconstitutional search and seizure. 67 F. App'x at 144; see also Mumma v. High-Spec, Inc., 400 F. App'x 629, 632 (3d Cir. 2010) (differentiating between "a new violation" to which the continuing violations doctrine applies and a "perpetuation of the original violation" to which it does not apply); Tearpock-Martini v. Borough of Shickshinny, 756 F.3d 232, 236–37 (3d Cir. 2014) (holding that, with respect to a street sign that violated the First Amendment, the continued presence of the sign was not a continuing violation because the only affirmative act was the initial installation of the sign). Here, the RESPA kickbacks and fees in this case are explicitly prohibited by statute. This makes them new independent violations rather than perpetuations of a violation (such as the continuing presence of a street sign or failure of the government to return one's records after a constitutional violation). These ongoing violations are not isolated or sporadic events. Rather, as alleged, they are all a part of one reinsurance scheme, the very nature of which requires the defendants to make continuous and periodic illegal kickbacks.

because the CFPB is an independent agency that is headed by one director rather than a multi-person commission. Id. at 12. In arriving at this decision, however, it did not vacate part of the CFPB's underlying decision on the merits. In particular, the D.C. Circuit expressly reserved the very issue in this case to be decided by the CFPB on remand:

> We do not decide here whether each alleged above-reasonable market value payment from the mortgage insurer to the reinsurer triggers a new three-year statute of limitations for that payment. We leave that question for the CFPB on remand and any future court proceedings.

Id. at 55 n.30.[5] Having read the CFPB's decision, it only follows that the D.C. Circuit at the very least acquiesced in the CFPB's holding that each RESPA violation triggers a new limitations period. By "leav[ing] that question" for the CFPB to decide on remand, the D.C. Circuit necessarily acknowledged that the CFPB has the authority to decide this issue. The fact that the D.C. Circuit—having exhaustively reviewed the CFPB decision for error—knows exactly how the CFPB already ruled on this issue is telling. Indeed, since the D.C. Circuit ruled on some of the CFPB's substantive RESPA findings, then certainly it could—and would—have reversed the CFPB on this issue had it disagreed with the CFPB's ruling.[6]

---

[5] In actions brought by the CFPB as opposed to a private person, a three-year—not one-year— statute of limitations applies. 12 U.S.C. § 2614.

[6] Even if one considers the CFPB's decision to be lacking in precedential value, that still would not preclude me from finding, based on RESPA's statutory language alone, that each violation of RESPA triggers a new one-year limitations period.

**d.      *Analogous Applications of the Continuing Violations
Doctrine***

As discussed in my prior decision in <u>White v. PNC Financial Services Group</u>, my finding regarding the application of the continuing violations doctrine in this context is bolstered by U.S. Supreme Court and Third Circuit case law involving analogous ongoing unlawful schemes that result in civil liability. <u>See</u> <u>id.</u>, Docket No. Civ.A. 11-7928, 2017 WL 85378, at *7–8 (E.D. Pa. Jan. 10, 2017). In <u>Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp.</u>, the U.S. Supreme Court addressed a factually similar scenario in the context of ERISA. Under a certain ERISA statutory provision, an employer is required to make a series of periodic payments into a trust fund. <u>Bay Area Laundry</u>, 522 U.S. 192, 196 (1997). The question was whether an employer's failure to make one of these required payments is an unlawful event that triggers a new limitations period every time it happens. <u>Id.</u> at 195. The U.S. Supreme Court, adopting the Third Circuit's approach to the issue, answered this question in the affirmative: "each missed payment creates a separate cause of action with its own six-year limitations period." <u>Id.</u> at 206 (citing <u>Bd. Trs. Dist. No. 15 Machinists' Pension Fund v. Kahle Engineering Corp.</u>, 43 F.3d 852, 857–61 (3d Cir. 1994)). In doing so, the Court emphasized that the statute required employers to make each payment when it became due. <u>Id.</u> at 208. Based on its finding, the Court allowed the plaintiffs to pursue recovery for missed payments that fell within the limitations period leading up to when they filed suit. <u>Id.</u> at 206. It only barred recovery for the first missed payment, which occurred outside the statute of limitations period. The same rationale applies here. Just as each

missed payment violates ERISA, each unlawful kickback, fee, or referral violates RESPA. Accordingly, each unlawful fee, kickback, or referral carries its own statute of limitations period that commences once the violation is committed. The nature of the conduct in <u>Bay Area Laundry</u> is also similar to the alleged conduct here. Both situations involve an ongoing series of statutory violations.

Similarly, in <u>In re Niaspan Antitrust Litigation</u>, our district court was confronted with an antitrust claim based on drug manufacturers' overpriced sales of pharmaceutical drugs. 42 F. Supp. 3d at 746. The court agreed with every single other court to consider the issue and held "that a new cause of action accrues to purchasers upon each overpriced sale of the drug." <u>In re Niaspan Antitrust Litig.</u>, 42 F. Supp. 3d at 747. Therefore, "the Court conclude[d] that plaintiffs' claims are timely under the continuing-violation doctrine." <u>Id.</u> Just like the reinsurance arrangement between defendants here, the factual basis for the plaintiffs' claims in the above case rested upon their entering into, and furtherance of, a continuing illegal scheme. <u>Id.</u> at 745. The fact that the illegal scheme in that case was one between drug companies, whereas here the alleged illegal scheme is between mortgage companies, does not eliminate the common thread between the two: both are an ongoing and anticompetitive arrangement between companies that results in periodic statutory violations.[7]

---

[7] In <u>In re Niaspan Antitrust Litigation</u>, the periodic violations were each sale of illegally overpriced drugs. Here, the periodic violations were each illegal kickback, fee, or referral.

*e.*     **The "One Violation" Reading of RESPA Contradicts U.S. Supreme Court Precedent**

Adopting the theory that any "violation" of RESPA can only occur at a closing would defy U.S. Supreme Court precedent. In Freeman v. Quicken Loans, Inc., the U.S. Supreme Court made perfectly clear that a "violation" of RESPA can occur in many different ways at many different times. Id., 132 S. Ct. 2034 (2012). Reading the plain language of the statute, the Court explained that borrowers may sue any time someone "violate[s] the prohibitions" of § 2607. Id. at 2038. Some of the "prohibitions" of § 2607 include the very violations alleged in this case: kickbacks, fees, and referrals. 12 U.S.C. § 2607(a), (b). The Court also offered hypothetical "violations" of the statute that have nothing to do with a real estate closing. Freeman, 132 S. Ct. at 2043 ("[A] settlement-service provider who agrees to exchange valuable tickets to a sporting event in return for a referral of business would violate § 2607(a)"); id. ("[A] settlement-service provider who gives a portion of a charge to another person who has not rendered any services in return would violate § 2607(b)"). Accordingly, I cannot agree that a RESPA violation only occurs at the closing because to do so would be to go directly against the U.S. Supreme Court's interpretation of RESPA.

*f.*     **Cunningham *and the Continuing Violations Doctrine***

Finally, my finding here does nothing to disrupt Cunningham or the state of the law regarding RESPA's relationship to the doctrine of equitable tolling. The equitable tolling doctrine and the continuing violations theory are two separate and distinct legal principles subject to entirely different analyses. See, e.g., Bennett v. Susquehanna Cty.

Children & Youth Servs., 592 F. App'x 81, 83–86 (3d Cir. 2014) (analyzing the equitable tolling doctrine separately from the continuing violations doctrine); McAleese v. Brennan, 483 F.3d 206, 217–20 (3d Cir. 2007) (same); Henchy v. City of Absecon, 148 F. Supp. 2d 435, 438–39 (D.N.J. 2001) (same). Indeed, courts have specifically found that plaintiffs who failed to plead fraudulent concealment in support of equitable tolling could nonetheless rely on a sufficiently alleged continuing violation. E.g., In re Niaspan Litigation, 42 F. Supp. 3d at 746–49.

Cunningham spoke only to the application of equitable tolling to RESPA's statute of limitations. The Third Circuit has never spoken on the continuing violations doctrine's applicability to RESPA. Cunningham did not address whether RESPA may be violated each time there is an illegal kickback, fee, or referral. As stated above, this question is independent from the well-settled principle that the limitations period begins to run at the closing of the loan.

Based on the above discussion, I conclude that the continuing violations doctrine applies to the plaintiffs' RESPA claims.[8]

---

[8] There has been some confusion in the use of the phrase "continuing violations." Kyle Graham, *The Continuing Violations Doctrine*, 43 Gonz. L. Rev. 271, 280–81 (2008). For example, in the CFPB's decision, it stated that it did not believe the continuing violations doctrine applied to the RESPA claims. However, it then held that the enforcement action was timely because the defendant "violated RESPA every time it accepted a reinsurance payment." In the Matter of PHH Corp., at 22. As explained by commentators, there are two different types of "continuing violation" theories that courts refer to. Graham, supra, at 280–81. With the first type of theory, "the limitations period on a claim does not necessarily begin to run as soon as its essential elements first fall into place, or when the plaintiff becomes aware that he or she has the makings of a valid cause of action. Instead, a claim subject to this approach will continue to build and absorb new wrongful acts for so long as the defendant perpetuates its misconduct." Id. With the second type of theory, the limitations period begins to run again and again "on a day-by-day, act-by-act, or similarly parsed basis." Id. at 281. Viewed in this light, the CFPB's

### 4.    Undue Delay and Prejudice

Having found that the continuing violations doctrine supports the plaintiffs' RESPA claims, I still must decide whether the instant motion to amend was unduly delayed or will prejudice the defendants. For the reasons discussed below, I find that the plaintiffs' motion to amend the complaint, with respect to their RESPA claims, is not unduly delayed and that the defendants would not be prejudiced by amendment.

### a.   Undue Delay

Delay alone is not sufficient to warrant denial of leave to amend. Adams, 739 F.2d at 868. It is only when delay becomes "undue" that it forms an adequate basis, on its own, for denial of a motion to amend. Bjorgung, 550 F.3d at 266. "Delay becomes 'undue,' and thereby creates grounds for the district court to refuse leave, when it places an unwarranted burden on the court or when the plaintiff has had previous opportunities to amend." Id. Thus, an undue delay analysis requires courts to focus on "the movant's reasons for not amending sooner." Id. Here, there was a stay imposed in the case, which both parties had jointly entered into, at the time the plaintiffs would have learned of the viability of their newfound legal argument. Thus, the plaintiffs' "delay," if any, in filing for leave to amend the complaint was not "undue."

Precedent strongly weighs in favor of allowing amendment of the plaintiffs' RESPA claims in this situation. In relying on U.S. Supreme Court precedent, the Third

---

decision endorsed one form (the second) of the continuing violations doctrine without calling it the "continuing violations doctrine;" the CFPB found that the defendants violated RESPA on an "act-by-act . . . basis" each time there was a kickback. Thus, its rejection of what it referred to as *the* "continuing violation" doctrine was really just a rejection of one form of the doctrine.

Circuit has cautioned that a district court may err by "not allowing plaintiffs an opportunity to allege a new legal theory after the original theory was dismissed on a [Rule] 12(b)(6) motion." Adams, 739 F.2d at 868–69 (citing Foman v. Davis, 371 U.S. 178 (1962)). In Adams, the Third Circuit extended this logic to an even later stage in the litigation: "Where the legal theory of a complaint is rejected by the district court on a motion for summary judgment, but where an alternative theory has been raised which, on the same facts, is legally sufficient, it would be unusual for a district court not to allow the plaintiff leave to amend because of 'undue delay.'" 739 F.2d at 868. In that case, the Third Circuit reversed the district court for depriving the plaintiffs of an opportunity to amend their complaint even after summary judgment had been granted. Id. at 869. In this case, the parties have not even proceeded to discovery, and stays were imposed before there was an opportunity for me to render a decision on the defendants' motion to dismiss. I will not, therefore, deny "the plaintiffs an opportunity to allege a new legal theory." Id. at 868.

### b. Prejudice

Amendment of the plaintiffs' RESPA claims would not prejudice the defendants. The plaintiffs' underlying factual allegations in support of their RESPA claims will stay the same. Consequently, the defendants will not undertake any new burden in grappling with new facts. They simply will be required to litigate a different legal issue regarding the same claims. In addition, prejudice is typically found only where a plaintiff moves to amend his or her complaint during or after discovery. See, e.g., Cureton, 252 F.3d at 274–76 (affirming district court's denial of leave to amend when amendment would require

the opposing party to "engage in burdensome new discovery and significant new trial preparation"). As previously stated, the parties have not yet begun discovery in this case.

### c.  <u>Futility</u>

The defendants argue that amendment to the RESPA claims would be futile because the claims are time-barred. Their argument is based on the same premise that I have dispelled above in finding that the continuing violations doctrine applies and that claims do not only accrue at the closing of a loan.

In sum, the plaintiffs did not unduly delay in moving to amend their complaint to make a new legal argument in support of their RESPA claims. The defendants have failed to show that amendment as to the RESPA claims would cause them prejudice or that amendment is futile. For all the above reasons, I will grant the plaintiffs' motion to amend their complaint to modify their RESPA claims.

### B.  *The Plaintiffs' Proposed RICO Claims*

Unlike with their RESPA claims, I find that the plaintiffs have unduly delayed in moving to amend the complaint in order to add claims under RICO. These new RICO claims do not relate back to the original complaint under Rule 15(c). For both of these reasons, I will deny the plaintiffs' motion to amend the complaint with respect to adding new RICO claims.

### 1.  <u>Undue Delay</u>

As noted above, the "undue delay" analysis focuses on the plaintiff's reasons for not moving to amend sooner. The assertion of entirely new RICO claims is distinct from

the plaintiffs' amendment to the legal theory underpinning their RESPA claims because it involves the addition of brand new causes of action.

The plaintiffs do not offer any reason to explain why they did not bring the RICO claims in their original complaint. The stays that were previously in place were certainly relevant to the plaintiffs' reasons for not amending their RESPA claims earlier, since the stays were related to those claims. But the stays had no bearing on the plaintiffs' ability, at any point, to assert RICO claims.

In considering whether to allow amendment, "[t]actical decisions and dilatory motives may lead to a finding of undue delay." Synthes, Inc. v. Marotta, 281 F.R.D. 217, 225 (E.D. Pa. 2012). The plaintiffs' proposal of brand new RICO claims in this case suggests a purely tactical decision.[9] Unlike the new theory that the plaintiffs have asserted in support of their previously filed RESPA claims, the plaintiffs would have known about the existence of the RICO statute from the very start of this case, but offer no reason to explain why they have not tried to assert RICO claims until now.

Simply put, the plaintiffs have provided no reason explaining why they now assert brand new RICO claims more than four years after being contacted by counsel[10] and

---

[9] This is in contrast to the plaintiffs' introduction of a new theory in support of their RESPA claims, since Cunningham foreclosed the plaintiffs' equitable tolling argument in support of their RESPA claims. As already explained, the subsequent assertion of the continuing violations theory was not unduly delayed or based on dilatory motives because the plaintiffs only recently became aware of this theory, during a time when the case was stayed. The plaintiffs cannot be said to have unduly delayed with respect to amending their RESPA claims simply because they vigorously litigated the equitable tolling issue and discovered a possible continuing violations argument (via the CFPB's decision) at the eleventh hour during the stay.

[10] Plaintiff Blake received a notice from counsel in October 2011 and communicated with counsel in March 2012; Plaintiff Orkis received a notice from counsel in September, 2011 and

nearly two-and-a-half years after filing their complaint. While the mere passage of time

does not amount to undue delay, I conclude that the amount of time that has passed,

coupled with the plaintiffs' failure to offer any reason for this delay, does.

### 2. **Relation Back**

Even if the plaintiffs had not unduly delayed, their RICO claims would not relate

back to their original complaint. For this reason alone, denial of the motion to amend to

add RICO claims is warranted.

The Third Circuit has made clear that "where the original pleading does not give a

defendant fair notice of what the plaintiff's [amended] claim is and the grounds upon

which it rests, the purpose of the statute of limitations has not been satisfied and it is not

an original pleading that [can] be rehabilitated by invoking Rule 15(c)." Glover, 698 F.3d

at 146 (alterations in original). A proposed amended claim only relates back if a party is

given some sort of notice—in the original pleading—of the legal basis upon which the

proposed amended claim is based. Id. As in this case, the plaintiffs' proposed RICO

claims require "amendments that significantly alter the nature of a proceeding by

injecting new and unanticipated claims[, which] are treated far more cautiously." Id.

Here, the proposed RICO claims are "new" and "unanticipated" since there has been no

indication that they would be brought since the filing of the complaint in 2013. The

original complaint did not put the defendants on fair notice that the plaintiffs could or

---

communicated with counsel in November, 2011.  (See Compl. ¶¶ 120–21, 125–26.)  Even going
by the later date of March 2012, more than four years passed between the time the plaintiffs
became aware of possible claims against the defendants and the date on which they sought to
amend their complaint, July 20, 2016.

would assert RICO claims. The original complaint is void of any language suggesting an "enterprise" or any of the other buzzwords that attend a RICO claim.[11]

Accordingly, I find that the plaintiffs' proposed RICO claims do not relate back under Rule 15(c).

## V.    CONCLUSION

The defendants violated RESPA—assuming the veracity, at this stage, of the plaintiffs' allegations—each time an allegedly illegal kickback, fee, or referral was given or received. This captive reinsurance scheme, as pled, constitutes a continuing violation of RESPA. Because I find the continuing violations doctrine applicable, the statute of limitations runs from the date of the last RESPA violation rather than the first. Burnette, 2003 WL 21293682, at *2 (citing Cowell, 293 F.3d at 292).[12] I also find that the amendment as to the RESPA claims was not unduly delayed and would not prejudice the defendants. But, for the reasons discussed above, I find that the plaintiffs unduly delayed in moving to add RICO claims and that these proposed RICO claims do not relate back to the original complaint.  Thus, the motion to amend the complaint is granted with respect to the RESPA claims, but is denied with respect to the proposed RICO claims.

An appropriate Order follows.

_____

[11] The RESPA claims do not present this problem. The plaintiffs' current use of a new legal argument—continuing violations—does not change the fact that the defendants have had notice all along of the legal basis for the plaintiffs' RESPA claims more generally.

[12] The parties have not briefed the exact filing dates that apply to plaintiffs' RESPA claims under the continuing violations doctrine. Thus, I do not decide, at this juncture, the exact filing dates that apply to the plaintiffs' RESPA claims. Such a decision at this stage would be premature. In re Niaspan Litig., 42 F. Supp. 3d at 747 n.7.